988 F.2d 1272
 300 U.S.App.D.C. 314, 61 USLW 2597
 FIRST NATIONAL BANK AND TRUST COMPANY, et al., Appellants,
v.
NATIONAL CREDIT UNION
ADMINISTRATION, et al.
FIRST NATIONAL BANK AND TRUST COMPANY, et al., Lexington
State Bank, Appellants,
v.
NATIONAL CREDIT UNION ADMINISTRATION.
 Nos. 91-5262, 91-5336.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Nov. 16, 1992.
Decided April 2, 1993.
 
 [300 U.S.App.D.C. 315] Michael S. Helfer, with whom William J. Kolasky, Jr., John J. Gill, and Michael F. Crotty, were on the brief, for appellants.
 Jonathan R. Siegel, Atty., Dept. of Justice, with whom Stuart M. Gerson, Asst. Atty. Gen., Jay P. Stephens, U.S. Atty., and Douglas N. Letter, Atty., Dept. of Justice, were on the brief, for appellee Nat. Credit Union Admin.
 Paul J. Lambert and Teresa Burke were on the brief, for appellees AT&T Family Federal Credit Union and Credit Union National Association, Inc.
 Edward C. Winslow and William C. Scott were on the brief, for amicus curiae North Carolina Alliance of Community Financial Institutions.
 Before: WALD, SILBERMAN, and D.H. GINSBURG, Circuit Judges.
 Opinion for the Court filed by Circuit Judge SILBERMAN.
 Concurring opinion filed by Circuit Judge WALD.
 SILBERMAN, Circuit Judge:
 
 
 1
 Appellants, four North Carolina banks and the American Bankers Association, challenged the National Credit Union Administration's (NCUA) approval of several recent applications by AT & T Family Federal Credit Union (AT & T Family) to expand its membership. According to appellants, the NCUA's decisions violated the requirement of the Federal Credit Union Act (FCUA) that membership in federal credit unions be limited to "groups having a common bond of occupation or association." 12 U.S.C. § 1759. The banks complain that, by allowing AT & T Family improperly to extend its membership and thereby its number of potential borrowing customers, the NCUA has made the credit union a formidable competitor. The district court applied the "zone of interests" tests for prudential standing and determined that appellants lacked standing to sue. Although we agree with the district court that the appellants were not intended beneficiaries of the FCUA, we think that they are suitable challengers because the statute arguably prohibits the competition of which they complain. This case thus falls within the rationale of Clarke v. Securities Industry Association, 479 U.S. 388, [300 U.S.App.D.C. 316] 107 S.Ct. 750, 93 L.Ed.2d 757 (1987), and Investment Company Institute v. Camp, 401 U.S. 617, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971). We reverse and remand to the district court.
 
 I.
 
 2
 Passed in 1934 in the midst of the Great Depression, the FCUA, 12 U.S.C. §§ 1751-1795k (1988), was designed to improve access to credit for people of "small means." S.REP. NO. 555, 73d Cong., 2d Sess. 1 (1934). For many working Americans, credit at reasonable rates had essentially disappeared in the years following the stock market crash. Lacking the security necessary to obtain loans from banks, working Americans turned to loan sharks who typically charged usurious interest rates, which was thought to reduce the overall purchasing power of American consumers. See 78 CONG.REC. 12,223 (1934). Congress saw the solution to this problem in a system of federal credit unions that would provide credit at reasonable rates and thus would help spur economic recovery. See id. at 7260, 12,223-25.
 
 
 3
 To ensure that credit unions fulfilled their purpose of meeting members' credit needs, Congress restricted credit unions' management and business activities. For example, a federal credit union is owned and controlled by its members, see 12 U.S.C. §§ 1757-1761, and it can make loans only to members or to other credit unions, see id. § 1757(5). Congress expected that such measures guaranteeing democratic self-government would infuse the credit union with a spirit of cooperative self-help and ensure that the credit union would remain responsive to its members' needs.
 
 
 4
 A related provision of the FCUA, the common bond requirement, is at the heart of this case. Section 109 of the Act restricts membership in federal credit unions to "groups having a common bond of occupation or association." 12 U.S.C. § 1759. For much of the Act's history, the NCUA interpreted this provision to require all members of a credit union to share the same bond. In the 1980s, however, the NCUA issued a series of Interpretive Ruling and Policy Statements (IRPS) construing the statute to allow a number of different groups, each having its own bond, to form a credit union, even though no overall common bond united the different groups. See 47 Fed.Reg. 26,808 (1982) (IRPS 82-3); 48 Fed.Reg. 22,899 (1983); 49 Fed.Reg. 46,536 (1984) (IRPS 84-1); 54 Fed.Reg. 31,165 (1989) (IRPS 89-1). The NCUA's most recent interpretation, IRPS 89-1, made clear that a credit union could comprise a "combination of distinct, definable occupational and/or associational groups." 54 Fed.Reg. 31,165, 31,170 (1989).
 
 
 5
 Appellants challenged several decisions in which the NCUA applied IRPS 89-1 to approve applications by AT & T Family to expand its field of membership. Until recently, AT & T Family's membership consisted primarily of employees of AT & T Technologies, Inc., AT & T Network Systems, and Bell Telephone Labs. In late 1989 and 1990, AT & T Family filed eight applications to extend its membership to include groups of employees from other companies such as the American Tobacco Company, Western Auto Supply Company, and WGHP-TV, to name but a few. In all, the NCUA approved the extension of AT & T Family's membership to 16 new employee groups. Appellants claimed before the agency and in the district court that IRPS 89-1 ignored the statutory language by allowing groups lacking any common bond between them to join together in a credit union. The banks contended that by allowing AT & T Family to expand to 71,000 members in violation of the statute, the NCUA has allowed the credit union, which is exempt from state and federal income taxes, see 12 U.S.C. § 1768, to become a formidable competitor to banks.
 
 
 6
 The district court granted NCUA's motion to dismiss for lack of standing. The court determined that appellants were not pressing claims "arguably within the zone of interests" protected by the FCUA. See First Nat'l Bank & Trust Co. v. National Credit Union Admin., 772 F.Supp. 609, 611-13 (D.D.C.1991). Relying on the language of this court's post-Clarke decisions on prudential standing, see, e.g., Hazardous Waste Treatment Council v. Thomas, 885 F.2d 918 (D.C.Cir.1989) (HWTC IV ); [300 U.S.App.D.C. 317] Hazardous Waste Treatment Council v. United States Envtl. Protection Agency, 861 F.2d 277 (D.C.Cir.1988),cert. denied, 490 U.S. 1106, 109 S.Ct. 3157, 104 L.Ed.2d 1020 (1989) (HWTC II ), the district court said that "[t]hose not regulated by an agency have standing only if they are the intended beneficiaries of the specific statute or are nonetheless 'suitable challengers' to the statute because their interests coincide with the interests which Congress did intend to protect." First Nat'l Bank, 772 F.Supp. at 611. The banks were not intended beneficiaries of the Act, thought the district court, because "the Act was passed to establish a place for credit unions within the country's financial market, and specifically not to protect the competitive interest of banks." Id. at 612; see also Branch Bank & Trust Co. v. National Credit Union Admin. Bd., 786 F.2d 621 (4th Cir.1986), cert. denied, 479 U.S. 1063, 107 S.Ct. 948, 93 L.Ed.2d 997 (1987). Under applicable precedent, the district court believed that the banks were not suitable challengers either. Because the banks and the credit union competed for the same business, any coincidence in their interests "would be at best fortuitous." First Nat'l Bank, 772 F.Supp. at 612. The banks, according to the district court, could not rely on the Supreme Court's cases, see, e.g., Clarke v. Securities Industry Ass'n, 479 U.S. 388, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987); Investment Co. Inst. v. Camp, 401 U.S. 617, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971) (ICI ); Association of Data Processing Serv. Orgs. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), that granted standing to competitors as suitable challengers because, unlike the competitors in those cases, the banks were not suing under an entry-restricting statute. See First Nat'l Bank, 772 F.Supp. at 613.
 
 II.
 
 7
 It should be noted that no one questions appellants' Article III standing; that appellants will suffer competitive or economic injury is not in doubt. The question before us is whether under the FCUA the banks can claim prudential standing as well. In other words, are they pursuing an interest (not just an objective), see HWTC IV, 885 F.2d at 925,[1] arguably within the zone of interests Congress intended either to regulate or protect, and, thus, are they among the class of persons entitled to sue to enforce FCUA's restrictions? See Clarke, 479 U.S. at 396, 107 S.Ct. at 755; Data Processing, 397 U.S. at 153, 90 S.Ct. at 829. This "zone of interests" test ensures that standing is granted only to plaintiffs who will not distort congressional objectives. It excludes those plaintiffs whose "interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." Clarke, 479 U.S. at 399, 107 S.Ct. at 757. Because the banks are not regulated by the common bond requirement, we must inquire whether the banks can be thought to have been "protected" by that statutory limitation on the activities of credit unions. Litigants can qualify as "protected" by a statute if they are intended beneficiaries of the legislation or are nevertheless what we have termed suitable challengers, see HWTC IV, 885 F.2d at 923-24; that is, if their interests are sufficiently congruent with those of the intended beneficiaries that the litigants are not "more likely to frustrate than to further the statutory objectives." Clarke, 479 U.S. at 397 n. 12, 107 S.Ct. at 756 n. 12.
 
 
 8
 Appellants claim that they qualify both as intended beneficiaries and as suitable challengers under the FCUA. We agree with the district court, however, that Congress did not, in 1934, intend to shield banks from competition from credit unions. Indeed, the very notion seems anomalous, because Congress' general purpose was to encourage the proliferation of credit unions, which were expected to provide service to those would-be customers that banks disdained. See 78 CONG.REC. 7259 (1934) (statement of Sen. Barkley) ("[B]ank[s] ... cannot extend credit to [300 U.S.App.D.C. 318] many of these people, because they do not have the required security."); id. at 12,225 (statement of Rep. Luce) (noting that credit unions would serve those "who do not use and cannot use banks ... for small borrowings"). The common bond requirement, an existing characteristic of state credit unions, was designed, in combination with the restriction that permitted credit unions to loan only to members, to ensure that credit unions would effectively meet members' borrowing needs. It would seem, therefore, that Congress assumed implicitly that a common bond amongst members would ensure both that those making lending decisions would know more about applicants and that borrowers would be more reluctant to default. That is surely why it was thought that credit unions, unlike banks, could "loan on character." See id. at 12,223. The common bond was seen as the cement that united credit union members in a cooperative venture, and was, therefore, thought important to credit unions' continued success.[2]
 
 
 9
 To be sure, as time passed--as credit unions flourished and competition among consumer lending institutions intensified--bankers began to see the common bond requirement as a desirable limitation on credit union expansion. To that end, in the 1970s bankers, according to appellants, became active in lobbying Congress to urge the maintenance of the common bond requirement. But that fact, assuming it is true, hardly serves to illuminate the intent of the Congress that first enacted the common bond requirement in 1934. And we find no indication that Congress was, at that earlier time, concerned about the competitive position of banks.
 
 
 10
 There remains, however, the more subtle question, whether banks can be thought suitable challengers to enforce a requirement designed to benefit the members--particularly potential borrowers--of credit unions. Appellants rely on the Supreme Court's reasoning in ICI and Clarke, and it seems to us the parallels between those cases and the present one are striking. In ICI the securities industry challenged a ruling by the Comptroller of the Currency that would have permitted banks to slip the Glass-Steagall leash and enter what was considered a part of the securities business. See ICI, 401 U.S. at 618-19, 91 S.Ct. at 1092-93. As the Supreme Court later explained in Clarke, the Glass-Steagall Act, which limited the securities underwriting and investment activities of banks, was designed to protect bank depositors from risky bank activities--not to insulate investment bankers, or indeed, any noncommercial bankers, from competition. See Clarke, 479 U.S. at 398 & n. 13, 107 S.Ct. at 756 & n. 13. Nevertheless, because the investment bankers pursued interests congruent with those of the intended beneficiaries, they were permitted to sue in ICI to enforce Glass-Steagall's restrictions on banks.
 
 
 11
 Similarly, in Clarke the ever-vigilant securities industry was permitted to challenge a Comptroller decision that authorized a national bank to offer discount brokerage services not only at its established branches, but also at locations both inside and outside the bank's home state. The challenge was based on the McFadden Act, which restricts the interstate branching of national banks. See Clarke, 479 U.S. at 391, 107 S.Ct. at 752. The Act was designed to establish competitive equality between national and state banks and thus to protect smaller banks from competition from out-of-state leviathans, see First Nat'l Bank v. Walker Bank & Trust Co., 385 U.S. 252, 261, 87 S.Ct. 492, 497, 17 L.Ed.2d 343 (1966), not to protect investment bankers. Nevertheless, the investment bankers had standing to sue. The Supreme Court relied on the correlative congressional objective of preventing national banks from gaining too much ("monopoly") control over credit and money through "unlimited branching." Clarke, 479 U.S. at 402, 107 S.Ct. at 758. Given [300 U.S.App.D.C. 319] that general congressional purpose, the Court thought that the securities industry, which was a competitor at least with respect to discount brokerage services, was a suitable challenger. In other words, even though the Congress that passed the McFadden Act was not at all concerned with the spread of discount brokerage--only branch-banking--and the securities industry was a competitor with regard to the former, not the latter, it was nevertheless permitted to challenge the spread of discount brokerage through the McFadden Act, again because of the congruence of plaintiffs' interests with those of the intended beneficiaries.
 
 
 12
 We take from these cases the principle that a plaintiff who has a competitive interest in confining a regulated industry within certain congressionally imposed limitations may sue to prevent the alleged loosening of those restrictions, even if the plaintiff's interest is not precisely the one that Congress sought to protect.[3] The limitations may be restrictions on entry--geographic or product line--or they might be, as in our case, limitations on growth, which are akin to entry restrictions. Like more classic entry restrictions, the common bond requirement, by limiting a credit union's customer base, effectively prevents the credit union from offering its services and competing in a broader market.
 
 
 13
 We previously have recognized the particular significance of statutory entry restrictions on prudential standing. In HWTC II, we distinguished the case before us from the Supreme Court's cases granting standing to competitors (Data Processing, ICI, and Clarke ), on the grounds that it did not involve an "entry-restricting" statute. See HWTC II, 861 F.2d at 284. Similarly, in Panhandle Producers & Royalty Owners Ass'n v. Economic Regulatory Administration, 822 F.2d 1105 (D.C.Cir.1987), we noted that "[c]ompetitors have a seemingly unbroken record of success in securing standing" in cases involving regulatory systems that "restrict[ ] entry into a particular field or transaction." Id. at 1109. Indeed, the district court attempted to distinguish this case from ICI and Clarke on the grounds that the common bond requirement was not an entry restriction.[4] See First Nat'l Bank, 772 F.Supp. at 613.
 
 
 14
 Appellees, sidestepping the entry-restriction cases, rely primarily on our refinement of prudential standing analysis in HWTC IV. In that case, an organization of companies that treated hazardous waste and marketed products derived from processed waste sued to force the EPA to adopt stricter environmental regulations on other companies so as to create a greater market for their own services and products. We held that HWTC's interests (irrespective of its particular objectives in the case before us) were not sufficiently congruent with those of the intended beneficiaries of the statute to make HWTC a suitable challenger. See HWTC IV, 885 F.2d at 924. The treatment firms' interest was in selling more services and equipment to the regulated companies, and therefore the firms would seek regulations that would increase demand for their product regardless of the effects on the statute's intended beneficiaries. We concluded that to have standing under the statute, HWTC would have to have shown a systematic alignment of interests with the statute's beneficiaries, see id. at 924, a standard that appellees understandably claim was stricter than our prior characterization of Clarke as a test requiring "less than a showing of congressional [300 U.S.App.D.C. 320] intent to benefit but more than a marginal relationship to the statutory purposes." HWTC II, 861 F.2d at 283.
 
 
 15
 Our decision did not rest on a conclusion that the economic interests of the treatment firms were somehow less deserving than the environmental interests the statute was designed to foster; nor was it based on a view that the firms' economic incentives were inherently less worthy than the economic objectives of the securities industry plaintiffs in ICI and Clarke. On the contrary, the economic motivations could be thought analogous. If the watchword of the treatment firms in HWTC IV was "treatment is good and more treatment is better," HWTC IV, 885 F.2d at 925, it might be said that the watchword of all competitors with regard to their potential rivals must be "regulation is good and more restrictive regulation is better." And one cannot base standing on one's mere status as an economic beneficiary of government regulation of others. In Lujan v. National Wildlife Federation, 497 U.S. 871, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990), the Supreme Court said:
 
 
 16
 [T]he failure of an agency to comply with a statutory provision requiring "on the record" hearings would assuredly have an adverse effect upon the company that has the contract to record and transcribe the agency's proceedings; but since the provision was obviously enacted to protect the interests of the parties to the proceedings and not those of the reporters, that company would not be "adversely affected within the meaning" of the statute.
 
 
 17
 Id. at 883, 110 S.Ct. at 3186.
 
 
 18
 The distinction between HWTC IV and the Supreme Court's Lujan hypothetical on the one hand and ICI and Clarke on the other must be that in ICI and Clarke the potentially limitless incentives of competitors were channelled by the terms of the statute into suits of a limited nature brought to enforce the statutory demarcation dividing the banking and securities industries. The interests the securities industry plaintiffs sought to protect were thus less open-ended and more confined than were the economic interests pursued in HWTC IV, and as a result there was a reduced danger of distorting congressional purpose. By contrast, nothing in the statute in HWTC IV could ensure that there would be any connection at all between the treatment firms' interests and the statutory purpose. "[T]here is not the slightest reason to think that treatment firms' interest in getting more revenue by increasing the demand for their particular treatment services will serve [the statute's] purpose of protecting health and the environment." HWTC IV, 885 F.2d at 924. There is, however, a reason to think that a competitor's interest in patrolling a statutory picket line will bear some relation to the congressional purpose, because the entry-like restriction itself reflects a congressional judgment that the constraint on competition is the means to secure the statutory end. The restriction connects the economic interests of competitors to the purposes of the statute and yet constrains competitors to a limited role in guarding a congressionally drawn boundary. In these circumstances the plaintiffs can be thought to have interests "systematically aligned" with those the statute is designed to benefit.
 
 
 19
 The securities industry plaintiffs in ICI and Clarke were not seeking to impose new regulations on banks in areas unrelated to an existing, specific statutory norm simply to provide a demand for their services or to weaken banks as competitors.[5] We certainly would not accept as a suitable plaintiff a party who had only a general economic interest in harming a competitor and who, accordingly, sought to impose some new, more onerous regulation upon that competitor. See, e.g., Calumet Indus., Inc. v. Brock, 807 F.2d 225, 228 (D.C.Cir.1986). But, when the plaintiff seeks to enforce a statutory restriction on [300 U.S.App.D.C. 321] his competitor--a restriction the plaintiff enjoys as well as the statutory beneficiaries--there is a good deal less risk that recognizing the plaintiff's standing will lead to a misdirection of a statutory scheme.
 
 
 20
 Our reasoning in HWTC suggests that our reaction might be different if the banks appeared before us, not asking to patrol the common bond picket line, but seeking a new regulation that would squeeze the credit unions into a smaller market or even eliminate them from the market altogether. It is unnecessary, however, to extend our holding into a definitive answer to appellants' hypotheticals; we concede that the general issue is devilishly complex. We feel confident, however, that this case is a good deal closer to the paradigm of ICI and Clarke than it is to HWTC, and, therefore, we hold that appellants have standing. The judgment of the district court is reversed and the case remanded.
 
 WALD, Circuit Judge, concurring:
 
 21
 The panel opinion's analysis of precedents on "entry-restricting" statutes quite correctly concludes that, under circuit case law, as well as under the Supreme Court's directives in Clarke v. Securities Industry Association, 479 U.S. 388, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987), and Investment Company Institute v. Camp, 401 U.S. 617, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971), plaintiff banks have standing to challenge the NCUA's interpretation of the common-bond requirement. I agree with my colleagues that, where an entry-restricting or analogous statute is involved, "a plaintiff who has a competitive interest in confining a regulated industry within certain congressionally imposed limitations may do so to prevent the alleged loosening of those restrictions, even if the plaintiff's interest is not precisely the one that Congress sought to protect." Panel opinion ("Panel op.") at 9.
 
 
 22
 I originally--and still--disagree, however, with the "suitable challenger" test articulated in Hazardous Waste Treatment Council v. Thomas, 885 F.2d 918 (1989) (HWTC IV ), which requires a "systematic coincidence," id. at 924, or "systematic alignment," Panel op. at 1277-78, 1278, of interests between the would-be plaintiffs and the statute's intended beneficiaries. As I stated at the time, I find this test without roots either in Supreme Court law[1] or in the general purposes of standing. See HWTC IV, 885 F.2d at 927-34 (Wald, C.J., dissenting). I recognize, however, that this test is nonetheless part of our circuit law. In that context, I agree with the panel opinion that, when an entry-restricting or analogous statute "reflects a congressional judgment that the restraint on competition is the means to assure the statutory end," Panel op. at 11, and plaintiffs seek only to "enforce the statutory demarcation," id., between the beneficiaries of a licensing scheme and their competitors, plaintiffs clearly satisfy the goal of the "suitable challenger" test, i.e., to ensure that plaintiffs are more likely to further than to frustrate the purpose of the statute. See HWTC IV, 885 F.2d at 925; see also Clarke v. Securities Industry Ass'n, 479 U.S. at 397 n. 12, 107 S.Ct. at 756 n. 12 (citing this as purpose of "zone of interest" test).
 
 
 
 [1]
 In HWTC IV, we emphasized that "it is the interests that the challenger seeks to protect and not the challenge with which we must be concerned." HWTC IV, 885 F.2d at 925
 
 
 [2]
 The Senate report on the bill praised credit unions for their record of successful service during the Depression, a record that contrasted sharply with a grim history of bank failures, and attributed the success largely to credit unions' self-government and attentiveness to members' needs. See SEN.REP. NO. 555, 73d Cong., 2d Sess. 2-4 (1934)
 
 
 [3]
 We cannot agree with the pre-Clarke reasoning of Branch Bank & Trust Co. v. National Credit Union Administration Board, 786 F.2d 621 (4th Cir.1986), in which the Fourth Circuit focused exclusively on the question whether banks' interests were intended to be protected under the FCUA and concluded that banks do not have standing under the FCUA, see id. at 626. The subsequent explication of the suitable challenger route to standing in Clarke empties the Branch Bank decision of its persuasiveness
 
 
 [4]
 We have expressed concern in the past about allowing potential plaintiffs to gain standing through a facile assertion that they are enforcing entry-restricting legislation (a concern that again highlights the importance we have implicitly attached to entry restrictions in standing cases). See HWTC II, 861 F.2d at 284. This, of course, is not such a case
 
 
 [5]
 Perhaps it is also relevant--in considering whether a plaintiff has prudential standing, if not Article III standing, see Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208, 227, 94 S.Ct. 2925, 2935, 41 L.Ed.2d 706 (1974)--to ask whether, as the Supreme Court may well have in ICI, one can be confident that the intended beneficiaries had sufficient incentive and organizational resources to sue. See HWTC II, 861 F.2d at 284
 
 
 [1]
 It should be noted that, while the Supreme Court in Clarke v. Securities Industry Association, 479 U.S. 388, 107 S.Ct. 750, 93 L.Ed.2d 757 (1988), did determine that the securities industry was a "proper party" to challenge the Comptroller's decision to permit expanded bank activities, id. at 403, 107 S.Ct. at 759, it did so under its own "not ... especially demanding" zone of interest test, id. at 399, 107 S.Ct. at 757, not under any "suitable challenger" test akin to that laid down in HWTC IV