**SCHERING CORP., Plaintiff,**

v.

**FOOD AND DRUG ADMINISTRATION, Defendant.**

Civ. No. 93-3493 (HLS).

United States District Court, D. New Jersey.

April 26, 1994.

---

Matthew P. Boylan, Lowenstein, Sandler, Kohl, Fisher & Boylan, Roseland, NJ, Robert P. Reznick, Hughes Hubbard & Reed, Washington, DC, for plaintiff.

Michael A. Chagares, Asst. U.S. Atty., Newark, NJ, Gerald C. Kell, Susan Strawn, Office of Consumer Litigation, Civ. Div., U.S. Dept. of Justice, Washington, DC, for defendant.

## OPINION

SAROKIN, District Judge.

Before the court are plaintiff's motion for summary judgment and defendant's cross-motion for judgment on the pleadings.

*Background*

Schering Corporation ["Schering"], a manufacturer of certain "pioneer" drug products,[1] brings this action to challenge the Food and Drug Administration's ["FDA"] 1992 regulation under which generic competitors of pioneer drugs are approved. *See* 21 C.F.R. § 320.1(e). Title I of the Drug Price Competition and Patent Term Restoration Act of 1984, Pub.L. No. 98–417, 98 Stat. 1585 (1984) [the "Hatch–Waxman Amendments" or "1984 Amendments"] to the federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301–394, provides an abbreviated new drug application procedure for FDA approval of generic drugs: the pioneer drug and its generic copy must be "bioequivalent" for FDA's approval without clinical testing to prove that the generic is safe and effective. 21 U.S.C. § 355(j)(7)(B).

The legislative history of the 1984 Amendments states that:

> The purpose of Title I of the bill is to make available more low cost generic drugs by establishing a generic drug approval proce-

---

1. A pioneer drug is the first drug product containing a particular active ingredient or ingredi- ents to obtain FDA approval for a specified use.

dure for pioneer drugs first approved after 1962.

*Schering Corp. v. Sullivan,* 782 F.Supp. 645, 650 (D.D.C.1992), *vacated sub. nom., Schering Corp. v. Shalala,* 995 F.2d 1103 (D.C.Cir. 1993); H.R.Rep. No. 857 (Part I), 98th Cong., 2d Sess. 14 (1984), *reprinted in* U.S.Code Cong. & Admin.News 1984, at 2647. However, Congress had another equally important consideration in mind—the safety of generic drugs approved through this abbreviated procedure. *See Tri–Bio Laboratories, Inc. v. U.S.,* 836 F.2d 135, 139 (3d Cir.1987), *cert. denied,* 488 U.S. 818, 109 S.Ct. 57, 102 L.Ed.2d 35 (1988) ("The 1984 Amendments ... reflect a statutory compromise of the competing concerns").

Prior to 1984, manufacturers desiring to sell generic copies of drugs approved after 1962 were required to submit full new drug applications. This involved a time consuming and expensive process which included comprehensive animal and human testing to show that the new drug is safe and effective. The 1984 Amendments free the manufacturer or distributor of a generic drug product from the clinical trial requirements as long as it could prove that the generic is bioequivalent to the already-approved pioneer drug it copies.

The Food, Drug, and Cosmetic Act provides two definitions of "bioequivalent," one of which is as follows:

A drug shall be considered to be bioequivalent to a listed drug if—

(i) the rate and extent of *absorption* of the drug do not show a significant difference from the rate and extent of *absorption* of the listed drug when administered at the same molar dose ... under similar experimental conditions....

21 U.S.C. § 355(j)(7)(B) (emphasis added). The second definition provides for intentional differences in absorption rate from the listed drug.

The FDA's 1992 regulation defines "bioequivalent" as follows:

the absence of a significant difference in the rate and extent to which the active ingredient or active moiety in pharmaceutical equivalents or pharmaceutical alternatives becomes *available* at the site of drug action when administered at the same molar dose and under similar conditions in an appropriately designed study....

21 C.F.R. § 320.1(e) (emphasis added). The FDA also provides for a second definition covering intended differences in rate of availability from the listed drug.

The FDA does not interpret the language of the 1984 Amendments as providing the two sole definitions of "bioequivalent." Rather, according to the FDA, the 1984 Amendments provide a "safe haven," such that if a generic meets one of the conditions defined therein, it must be deemed bioequivalent. A safe haven interpretation does not bar other means of determining bioequivalence, but under Schering's interpretation, the two definitions are the exclusive determinants of bioequivalence.

Schering manufactures certain non-systemically effective drugs ["NSED"s]. NSEDs, such as skin ointments or drug-containing mist inhalers, directly deliver the drug to the site of drug action, rather than through introduction of the drug into the bloodstream. Schering claims that the FDA impermissibly diverged from congressional intent by substituting the broader concept of "availability" in the 1992 regulatory definition of bioequivalence for "absorption" as found in the 1984 Amendments. Schering's immediate concern is whether, as it argues, the abbreviated approval procedure is inapplicable to NSEDs which, by definition, do not depend upon systemic absorption to achieve their effect.

In December 1989, Schering filed a Citizen Petition which essentially argued that the bioequivalence requirement could be met only by satisfying one of the two showings set forth in Section 355(j)(7)(B); that such a showing could not be made for NSEDs under available scientific methods; and thus the FDA could not approve generic NSEDs via the abbreviated procedures. Schering initially brought suit in the United States District Court for the District of Columbia. *See Schering Corp.,* 782 F.Supp. 645. The district court ruled in favor of the FDA. However, while the case was on appeal, the FDA finalized its revised regulatory definition of

bioequivalence. The circuit court ruled that this agency action mooted the challenge based upon the FDA's response to Schering's Citizen Petition and vacated the district court's judgment. *See Schering Corp.*, 995 F.2d 1103. The court suggested that a challenge to FDA's construction of Section 355(j)(7)(B) should best be brought in the context of the new 1992 regulations, and this case ensued. *Id.* at 1105.

Schering now moves for summary judgment and injunctive relief[2], and the FDA cross-moves for a judgment on the pleadings.

*Discussion*

### The FDA's Standing Challenge

■ The FDA challenges Schering's standing to bring suit against its implementation of the 1984 Amendments. Schering's first counterargument is that the FDA, by regulation, has conferred standing upon it. Schering claims that its participation in the rulemaking process for the contested 1992 regulations satisfies the definition of "interested person" such that Section 10.45(d)(1)(ii) of Title 21, Code of Federal Regulations, confers standing upon it.[3]

■ The court agrees with the FDA's arguments that an administrative agency cannot circumvent the requirements for Article III standing nor the requirements for prudential standing where suit has been brought pursuant to Section 702 of the Administrative Procedures Act ["APA"].[4] The Supreme Court has held that the issue of standing is one of "interpreting congressional intent": " 'Congress can, of course, resolve the question [of standing] one way or another, save as the requirements of Article III dictate otherwise.' " *Clarke v. Securities Industry Assn.,*

479 U.S. 388, 394 & n. 7, 107 S.Ct. 750, 754 & n. 7, 93 L.Ed.2d 757 (1986) (quoting *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 154, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970)) (citation omitted). The FDA cannot infringe upon congressional authority by removing prudential standing barriers through its regulations.

The FDA concedes that "[t]he loss of Schering's monopoly profits is an adequate allegation of injury-in-fact for purposes of Article III standing." Govt.Mem. at 13. Hence, the court turns to a consideration of prudential standing analysis. The Supreme Court first determined that Congress did not intend that every party suffering injury in fact has standing under Section 702 of the APA, the language of which grants standing to a person "aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. The Court then gave a "gloss" to the meaning of Section 702, requiring that

the complainant be 'adversely affected or aggrieved,' *i.e.,* injured in fact, the additional requirement that 'the interest sought to be protected' by the complainant [be] arguably within the *zone of interests* to be protected or regulated by the statute or constitutional guarantee in question.

*Clarke,* 479 U.S. at 395–96, 107 S.Ct. at 754–55 (quoting *Data Processing,* 397 U.S. at 153, 90 S.Ct. at 830) (emphasis added).

The Court refined its "zone of interests" test to deny standing where the interests of a plaintiff, who is not the subject of the agency's action, "are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed

---

**2.** Schering requests that the court enjoin the FDA from releasing safety and efficacy data for its NSEDs. Section 355(*l*) provides that "unless extraordinary circumstances are shown" the FDA shall make available to the public the safety and effectiveness data upon which approval of a pioneer drug was based:

(5) upon the effective date of the approval of the first application under subsection (j) of this section [the abbreviated procedure] which refers to such drug or upon the date upon which the approval of an application under subsection (j) of this section which refers to such drug could be made effective if such an application had been submitted.

21 U.S.C. § 355(*l*)(5).

**3.** An "interested person is affected by, and thus has standing to obtain judicial review of final agency action...." 21 C.F.R. § 10.45(d)(1)(ii).

**4.** Section 702 provides as follows:

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof....

that Congress intended to permit the suit." *Clarke,* 479 U.S. at 399, 107 S.Ct. at 757. If a plaintiff is not subject to the regulation, it may still have standing if

> [it] can qualify as "protected" by a statute ... [as either the] intended beneficiaries *of* the legislation or ... what we have termed *suitable challengers;* that is, if their interests are sufficiently congruent with those of the intended beneficiaries that the litigants are not "more likely to frustrate than to further the statutory objective."

*First Nat'l Bank and Trust Co. v. Nat'l Credit Union Adm.,* 988 F.2d 1272, 1275 (D.C.Cir.), *cert. denied sub. nom., AT & T Family Fed'l Credit Union v. First Nat'l Bank & Trust Co.,* —— U.S. ——, 114 S.Ct. 288, 126 L.Ed.2d 238 (1993) (citations omitted).

The FDA argues that Schering's economic interest in protecting itself from competitors is "antithetical" to the purposes of the Hatch–Waxman Amendments which were designed to benefit the public with an increased choice of less expensive generic drugs. Govt. Mem. at 13. Schering, in its second counterargument to the FDA's lack of standing claim, argues in essence that it is a "suitable challenger" of the regulation. Schering contends that the cases which the FDA cites are concerned with a plaintiff's desire to protect itself from *existing* competitors whereas, in this case, Schering is seeking "only to enforce statutory 'entry restricting' requirements, like those involved in the FDA generic drug approval process." Pltf.Reply at 6–7.

■ The court determines that the abbreviated process acts as an "entry restriction" in that it sets a threshold, albeit a significantly lower one than the regular procedures, which generic drug makers must satisfy to obtain FDA approval. The court holds that Schering is a suitable challenger for standing purposes. Schering's situation is analogous

to those presented in the cases it cites to support its position such that

> [t]he restriction connects the economic interests of competitors to the purposes of the statute and yet constrains competitors to a limited role in guarding a congressionally drawn boundary. In these circumstances the plaintiffs can be thought to have interests "systematically aligned" with those the statute is designed to benefit.

*First National,* 988 F.2d at 1278.

For example, Schering emphasizes the *First National* court's language that "a plaintiff who has a competitive interest in confining a regulated industry within certain congressionally imposed limitations may sue to prevent the alleged loosening of those restrictions, even if the plaintiff's interest is not precisely the one that Congress sought to protect." 988 F.2d at 1277. Here, although Schering's interest in limiting competition hinders Congress' desire to increase the public's access to less expensive generics, Schering's request that this court "patrol[ ] a statutory picket line" furthers Congress' twin desire to insure the safety of the generic drugs approved via the abbreviated procedures. *Id.* at 1278.

The *First National* court's focus upon the "congruence of plaintiffs' interest with those of the intended beneficiaries" of the legislation supports this interpretation. *Id.* at 1277. In both Supreme Court cases which the *First National* court analyzed, the plaintiffs' desires to limit entry converged with the legislation's purpose of protecting the intended beneficiaries from the dangers of too liberal policies, despite the fact that Congress did intend to protect those plaintiffs. *Id.* at 1276–77; *see also Clarke,* 479 U.S. 388, 107 S.Ct. 750; [5] *Investment Company Institute v. Camp,* 401 U.S. 617, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971).

---

5. In *Clarke,* "the ever-vigilant securities industry was permitted to challenge a Comptroller decision that authorized a national bank to offer discount brokerage services not only at its established branches, but also at locations both inside and outside the bank's home state." *First National,* 988 F.2d at 1276. The legislation at issue "was designed to establish competitive equality between national and state banks and thus to protect smaller banks from competition from out-of-state leviathans, not to protect investment bankers." *Id.* The Supreme Court deemed that the plaintiffs had standing where their interests in squelching competition from national banks furthered the legislation's purpose of protecting state banks.

Hence, in *Investment Company*, the plaintiff investment bankers had standing to challenge "a ruling by the Comptroller of the Currency that would have permitted banks to slip the Glass–Steagall [Act] leash" where that Act "limited the securities underwriting and investment activities of banks ... [in order] to protect bank depositors from risky bank activities—not to insulate investment bankers ... from competition."[6] *First National*, 988 F.2d at 1276 (citation omitted).

The court concludes that Schering's interest in protecting its profits is congruent with one of two intertwined congressional concerns. Given the fact that Congress' desire to ease the entry of generics into the market exists in tension with its desire to guarantee the safety of those competitor drugs, the court determines that Schering should not be denied standing merely because its interests complement one but conflict with the other of two congressional goals. The court does not reach the parties' other standing arguments and now turns to the merits of the statutory construction issue.

*Summary Judgment and Judgment on the Pleadings Claims*

This court can only grant summary judgment if there are no issues of material fact and, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Wisniewski v. Johns–Manville*, 812 F.2d 81, 84 (3d Cir.1987).

 In light of the parties' submissions outside the briefing papers, the court will treat the FDA's motion to dismiss as a summary judgment motion. The court adopts

the reasoning of Judge Boudin in the parties' identical case before him in the Federal District Court for the District of Columbia. *See Schering*, 782 F.Supp. at 648–51. Upon reviewing the parties' papers and Judge Boudin's opinion, the court concludes that Congress had not set forth an exclusive definition of "bioequivalent" in the 1984 Amendments. Accordingly, the court denies Schering summary judgment and grants the FDA summary judgment. Since the court rules in favor of the FDA on the merits, the court denies Schering's request for injunctive relief precluding the FDA from releasing Schering's safety and efficacy data.

---

6. Schering also cites to several other cases which support its position. In *Data Processing*, the Court determined that data processing services have standing to challenge a ruling of Comptroller of the Currency permitting national banks to offer data processing services where the congressional act was designed to limit banks' activities to bank services. 397 U.S. 150, 90 S.Ct. 827.

In *Panhandle Producers v. Economic Reg. Admin.*, the court of appeals found that plaintiff, an association "representing the interests of domestic gas producers, royalty owners and service

companies, and its members," had standing to challenge the Economic Regulatory Administration's order granting a Canadian natural gas importer blanket authorization to import gas for two-year period pursuant to Section 3 of the Natural Gas Act. 822 F.2d 1105 (D.C.Cir.1987). The court found prudential standing where plaintiff's interests in restricting entry into the domestic natural gas market arguably fit the statutory objectives of ensuring the import's competitiveness and protecting regional and national interests.