RENDERED: MAY 20, 2010
TO BE PUBLISHED

# Supreme Court of Kentucky

2008-SC-000877-DG

FINAL

DATE _1-18-10_ _Althea Hicks_

MEMBERS CHOICE CREDIT UNION; BEACON
COMMUNITY CREDIT UNION; SERVICE ONE
CREDIT UNION; C & O CREDIT UNION;
GREATER KENTUCKY CREDIT UNION INC.;
KENTUCKY EMPLOYEES CREDIT UNION                          APPELLANTS


ON REVIEW FROM COURT OF APPEALS
V.          CASE NOS. 2007-CA-002353-MR AND 2007-CA-002384-MR
FRANKLIN CIRCUIT COURT NO. 06-CI-00737


HOME FEDERAL SAVINGS AND LOAN ASSOCIATION                 APPELLEE


**OPINION OF THE COURT BY JUSTICE NOBLE**

**REVERSING AND REMANDING**

The sole question presented in this appeal is whether the statutory

limitation on credit union membership in KRS 286.6-107, as amended in 1984,

precludes membership based on a geographic connection. The Court of Appeals

held that it does. This Court disagrees and therefore reverses.

## I. Background

The Department of Financial Institutions ("DFI") charters, regulates, and

supervises financial institutions in Kentucky, including banks, trust

companies, savings and loan associations, and credit unions.[1] Included under

---

[1] DFI is part of the Public Protection Cabinet and was formerly known as the Office of
Financial Institutions.

its purview is implementation of KRS 286.6-107, which places limits on membership in credit unions. Since 1984, the statute has limited credit union membership "to persons having a common bond of similar occupation, association or interest." KRS 286.6-107(2).

Previous versions of the statute had specifically allowed membership based on a "common bond" (or, as the statute then put it, "mutual affiliation") of geography, known in the industry as a "community" field of membership. Even after the statute was amended to remove the geographic and other categories to read as it now does, however, DFI had an informal policy in place allowing credit union membership where the "common bond" was geography.

Upon discovery of this informal policy in 2006, Appellee Home Federal Savings and Loan Association filed a petition for a declaratory judgment against DFI in the Franklin Circuit Court. Home Federal is a federally chartered thrift located in Ashland, Kentucky. It sought a declaration that DFI had acted outside its statutory authority, and had unconstitutionally acted in a legislative capacity, by chartering credit unions with a geographic field of membership after the current version of the statute was enacted.

In 2007, the six Appellant credit unions sought and were granted leave to intervene as defendants. The credit unions were all chartered and are regulated by DFI, and each alleged that they had previously been granted permission by DFI to amend their bylaws to allow geographic fields of membership.

The circuit court granted summary judgment in favor of Home Federal, concluding that DFI was no longer authorized to charter credit unions with geographic fields of membership. The court began by analyzing the language of the statute. The court found that the current version of the statute was patterned

2

after the Model Credit Union Act of 1979, but only in part because the 1984 amendments to the statute omitted the model act's language that expressly allowed geographic and several other specific fields of membership. Based on the deviation from the model act, the court held that the legislature had "considered and rejected the option of allowing community based, or geographic, fields of membership" when it amended the statutes. The court then prospectively enjoined DFI "from approving articles of incorporation or bylaws that provide for a geographic field of membership for credit unions" and from approving "the amended bylaws of [the] [i]ntervening [credit unions] allowing a geographic field of membership," and enjoined the intervening credit unions from "accepting new members whose only basis for membership is 'a common bond of interest' that is based on geography."

The Court of Appeals affirmed, adopting as its own the trial court's discussion of whether the statute allows geographic fields of membership.

## II. Analysis

As noted above, the sole question before the Court is whether the current version of the credit union membership statute allows geographic fields of membership for state-chartered credit unions.[2] The obvious place to start is with the language of the statute itself.

Currently, KRS 286.6-107 in its entirety states:

---

[2] Other issues, such as whether the Appellee had standing to sue and whether administrative remedies were exhausted, were addressed in the lower courts. Because those issues have not been pursued further in this appeal, this Court need not address them. To the extent that this Court could address them sua sponte because they touch on jurisdiction (e.g., the standing issue), it is unnecessary to do so because it does not appear that the lower courts erred in resolving them as they did.

(1) The membership of a credit union shall be limited to and consist of the subscribers to the articles of incorporation and such other persons within the common bond set forth in the bylaws as have been duly admitted members, have paid any required entrance fee or membership fee, or both, have subscribed to one (1) or more shares, and have paid the initial installment thereon, and have complied with such other requirements as the articles of incorporation or bylaws specify.

(2) Credit union membership shall be limited to persons having a common bond of similar occupation, association or interest.

Both subsections include limiting language ("shall be limited") and refer to a "common bond" among all the members of the credit unions. The first subsection states that the membership shall be limited to persons sharing the common bond described in the founding documents of the credit union; the second subsection states the limits on allowable common bonds.

The common-bond requirement is not defined in the credit union statutes. It is, however, a term of art employed with regard to the credit union industry. *Black's Law Dictionary* defines the "common-bond doctrine" as "[t]he rule that prospective members of a credit union must share some connection (such as common employment) other than a desire to create a credit union." *Black's Law Dictionary* 292 (8th ed. 2004). The allowable common bonds under the statute are occupation, association, and interest.

Occupation, of course, refers to a person's work, job or employment. *See id.* at 1109 (defining "occupation" as "[a]n activity or pursuit in which a person is engaged; esp., a person's usual or principal work or business"). This is a relatively concrete category, intended to create a field of membership for a group of persons who have the same job or profession, such as accounting or

4

plumbing. Based on the plain language of the term alone, it is not broad enough to cover a geographic field of interest.

The other two categories are much broader, however. "Association" is defined as "1. The process of mentally collecting ideas, memories, or sensations. 2. A gathering of people for a common purpose; the persons so joined. 3. An unincorporated organization that is not a legal entity separate from the persons who compose it." *Id.* at 132. "Interest" is defined as "1. The object of any human desire; esp., advantage or profit of a financial nature .... 2. A legal share in something; all or part of a legal or equitable claim to or right in property ...." *Id.* at 828. The definition in *Black's* also includes this postscript: "Collectively, the word includes any aggregation of rights, privileges, powers, and immunities; distributively, it refers to any one right, privilege, power, or immunity." *Id.*

Unfortunately, the terms "association" and "interest" are too vague to allow easy interpretation based on plain language alone.

The Appellants argue that the words, which were added by the 1984 amendment to the statute, were intentionally vague so as to broaden the permissible fields of credit unions. This approach clearly has some appeal because the 1984 amendment substituted the generic language for the previous specific categories. The Appellants also argue that the lower courts' readings of the amendments to the statute—i.e., as a rejection of those specific categories considered during the drafting of the statute but ultimately not listed—would lead to an absurd result because it would effectively nullify all the traditionally accepted fields of membership.

5

The Appellee responds that the legislature's decisions not to list the previously allowed categories and to consider and then reject the model act's language concerning specific categories, including a geographic field, are indicative of its intention to omit some fields of membership. The Appellee also argues a broad reading of the statute renders its limiting language effectively a nullity.

Both sides claim support in the history of the statute, particularly in the various changes in allowable membership over time. A review of that history is therefore necessary.

Since 1922, the General Assembly has regulated the formation of state-chartered credit unions. *See* 1922 Ky. Acts ch. 110. Originally, there were no limitations on their membership. *See* 1922 Ky. Acts ch. 110, § 5 (codified as Ky. Stat. 883g-5). At the time, the membership portion of the statute read:

> The membership of the corporation shall consist of the incorporators and such persons, societies, associations, co-partnerships, and corporations as have been duly elected to membership and have subscribed for one or more shares and have paid for the same in whole or in part, together with the entrance fee as provided in the by-laws and have complied with such other requirements as the articles of incorporation may contain.

*Id.*

In 1940, the General Assembly amended the statute to limit credit union membership to four specific "fields," one of which was geographic, albeit limited to two thousand members. *See* 1940 Ky. Acts ch. 19. This version of the statute kept intact the language from the 1922 statute, albeit with minor variations in punctuation and a few added words, but added the following proviso:

6

Provided, however, that membership in each corporation organized under the terms of this Act, shall be limited to those persons, societies, associations, co-partnerships, and corporations, who or which, independent of their membership in the credit union, shall have a mutual affiliation, with another, by either (1) duly enrolled membership in a religious, social, or educational group or association, or (2) by identity of profession, occupation, trade, or business or bona fide members of a common bona fide profession, occupation, trade, or business group, or (3) by the identity of their employer, or (4) by their location for residential or occupational purposes, within an area, to be defined in the by-laws, containing, at the time the credit union is so organized, not more than two thousand persons, societies, associations, co-partnerships, or corporations, who or which, by the purchase of shares and election to membership, might become members of such credit union.

*Id.* When the General Assembly revised Kentucky's statutes in 1942, section 883g-5 was renumbered and recodified as KRS 290.080, with no substantive changes. The 1940 version of the statute remained in place until 1984, when the General Assembly repealed it and enacted in its stead KRS 290.107.

Appellee claims that the 1984 amendments to the credit union statutes that followed were patterned after the Model Credit Union Act of 1979. The relevant part of the model act states,

(1) The membership of a credit union shall be limited to and consist of the subscribers to the articles of incorporation and such other persons within the common bond set forth in the bylaws as have been duly admitted members, have paid any required fee, or both, have subscribed to one or more shares, and have paid the initial installment thereon, and have complied with such other requirements as the articles of incorporation or bylaws specify.

(2) Credit union membership may include, but is not limited to groups having a common bond of similar occupation, association, or interest, or to groups who reside within an identifiable neighborhood, community, or rural district, or to employees of a common employer, or to persons employed within a defined business district, industrial park or shopping center, and members of the immediate families of such persons.

Model Credit Union Act § 4.10 (1979).

The bill that was actually proposed in 1984, however, was slightly different from the model act. The bill incorporated the first subsection of the model act almost word for word. The bill's second subsection, unlike the model act, stated,

> Credit union membership *shall be limited* to *persons* having a common bond of similar occupation, association, or interest, or to persons who reside within an identifiable neighborhood, community, or rural district, or to employees of a common employer, or to persons employed within a defined business district, industrial park or shopping center, and members of the immediate family of such persons.

S.B. 255, § 11(2), 1984 Gen. Assem., Reg. Sess. (Ky. 1984), *reprinted in* 1 *Journal of the Senate of the General Assembly of the Commonwealth of Kentucky* 475, at 477 (February 28, 1984) (emphasis added). Unlike the model act, this version was not permissive as to who could be members of credit unions, employing the language "shall be limited" rather than "may include, but is not limited," and replaced "groups" with "persons."

The final version of the bill, the one passed and signed into law, was even more different from the model act. It retained the subsection (1) language but removed from the second subsection any mention of geographic or other specific fields, stating only that "[c]redit union membership shall be limited to persons having a common bond of similar occupations, association or interest." KRS 290.107(2) (1984). In 2005, KRS 290.107 was renumbered as KRS 286.6-107. *See* 2006 Ky. Acts ch. 247, §§ 38-39. The language currently in force is that which was enacted in 1984.

In January 2006, DFI proposed an administrative regulation to establish filing requirements for the amendment or establishment of the bylaws of a

credit union serving a community field of membership. *See* 32 Ky. Admin. Register 1497 (Feb. 2006) (proposed regulation approved by agency on Jan. 12 and filed with Legislative Research Commission on Jan. 13, with a proposed public hearing on Feb. 21). The regulation proposal was withdrawn in February. *See* 32 Ky. Admin. Register, at L-12 (June 2006). The Appellee claims that the proposed regulation was withdrawn "in the face of formal protests." Despite withdrawing the regulation, DFI appears to have adopted an informal policy of allowing credit union charters based on geographic or community field of membership.

With this history in mind, this Court concludes that the Appellee's argument that the terms "association" and "interest" should be read as excluding geographic and other traditionally accepted fields of membership because of the departure from the model act is not convincing. Admittedly, when a legislature's enactment departs from the language of a model act, "it usually does so to express an intention different from the model act." *The Bank/First Citizens Bank v. Citizens & Assocs.*, 82 S.W.3d 259, 264 (Tenn. 2002). But this approach is primarily relevant when the legislature is working in a vacuum, building first principles in an area of the law.

While the statutory history does show that the General Assembly considered and rejected portions of the Model Credit Union Act, it is also true that credit unions were already regulated by statute in Kentucky and had been so for over sixty years. And "statutes are construed by the courts with reference to the circumstances existing at the time of the passage." *United States v. Wise*, 370 U.S. 405, 411 (1962). The relevant comparison here is to

9

the statutory language that existed at the time the legislature considered the model act. Where such context exists, it does not automatically follow that the legislature meant anything by a departure from the model act. Rather, the difference between the former and current versions of the statute is the primary indicator of the legislature's intent to change the statute's meaning. When the legislature amended the statute in 1984, it moved from specific, narrow allowable categories to more generic language. This indicates a legislative intent to broaden the allowable categories of membership, which would include at least those areas previously allowed, so long as they could reasonably be understood to fit within the current language of the statute.

This is not to say, of course, that the legislature's decision to change to broader language in 1984 means that the categories of allowable membership are limitless. As noted above, "interest" is a very broad term, meaning the "object of any human desire." If a shared interest in this sense were the only "limit" on credit union membership it would be no limit at all. For example, the mere interest in membership in a credit union together would be sufficient.

This is why the statute's use of the phrase "common bond" is important. As noted above, that phrase is a term of art used in credit union law and means, at the very least, something more than a shared desire to have a credit union. The phrase, then, has a limiting effect on the allowable categories that follow it. The full extent of that effect, however, is only apparent when considered in the context of the overall history of credit unions and the evolution of the law related to them.

Credit unions were a European innovation that spread to the United States first at the state level and then to the federal level. As the U.S. Supreme Court has noted,

> Credit unions originated in mid-19th-century Europe as cooperative associations that were intended to provide credit to persons of small means; they were usually organized around some common theme, either geographic or associational. Following the European example, in the 1920's many States passed statutes authorizing the chartering of credit unions, and a number of those statutes contained provisions similar to [the federal] common bond requirement.

*Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522 U.S. 479, 494 n.6 (1998). Kentucky was part of this trend, albeit without the strong common bond requirement initially, with its first credit union statute passing into law in 1922.

"During the Great Depression, in contrast to widespread bank failures at both the state and national level, there were no involuntary liquidations of state-chartered credit unions." *Id.* As a result, Congress turned to credit unions, which had already proven successful at the state level, as an alternative to traditional financial institutions, first with the District of Columbia Credit Union Act in 1932 and then the Federal Credit Union Act (FCUA) two years later. "When Congress enacted the FCUA, sponsors of the legislation emphasized that the cooperative nature of credit unions allowed them to make credit available to persons who otherwise would not qualify for loans." *Id.*

In essence, credit unions were designed so that people without the means to access traditional financial institutions, such as banks, could still

11

obtain credit in the legitimate marketplace. *See First Nat'l Bank and Trust Co. v. Nat'l Credit Union Admin.*, 988 F.2d 1272, 1274 (D.C. Cir. 1993) ("Lacking the security necessary to obtain loans from banks, working Americans turned to loan sharks who typically charged usurious interest rates, which was thought to reduce the overall purchasing power of American consumers. Congress saw the solution to this problem in a system of federal credit unions that would provide credit at reasonable rates and thus would help spur economic recovery." (citation omitted)); *see also* William A. Lovett, *Banking and Financial Institutions Law in a Nutshell* 284 (1997), *quoted in Black's Law Dictionary* 398 (8th ed. 2004) ("Credit unions were the last major thrift institutions developed in the United States .... What distinguished credit unions from mutual savings banks and savings and loan associations was their emphasis on a common bond of workers, church members, or people in a local area, wanting to borrow relatively small amounts at reasonable interest rates from each other, and help each other save to meet these short-term needs. Their goal was to provide a low interest rate alternative ... to loan sharks and pawnbrokers.").

Credit unions differ from traditional banks in many ways. They are not-for-profit entities, are run by their members, and may provide services only to members. Additionally, they are not subject to income tax or many of the financial regulatory schemes, such as the Community Reinvestment Act.

Perhaps the most important distinction between credit unions and other financial institutions, however, is the common bond requirement. The requirement is a defining characteristic of credit unions, both at the federal

and state levels. *See, e.g.,* Wendy Cassity, Note, *The Case for a Credit Union Community Reinvestment Act,* 100 Colum. L. Rev. 331, 335 (2000) ("The ability to form a federal credit union hinges on the existence of a 'common bond' that is shared by a group of people."); *First Nat'l Bank and Trust Co.,* 988 F.2d at 1276 (noting the common bond requirement for state credit unions preceded the existence of federal credit unions).

The success of credit unions was thought to stem in large part from the common-bond requirement. *See Nat'l Credit Union Admin,* 522 U.S. at 494 n.6 ("The cooperative nature of the institutions, which state-law common bond provisions reinforced, was believed to have contributed to this result."). As a result, common bond provisions, which were already required by many states, were included in both federal acts authorizing federally chartered credit unions. *Id.* The U.S. Supreme Court has stated that historic understanding of the role of the common-bond requirement "confirms that [it] was thought to reinforce the cooperative nature of credit unions, which in turn was believed to promote their safety and soundness and allow access to credit to persons otherwise unable to borrow." *Id.*

Or, as the D.C. Circuit Court of Appeals stated more expressly of the requirement, at least as it exists under federal law,

> The common bond requirement, an existing characteristic of state credit unions, was designed, in combination with the restriction that permitted credit unions to loan only to members, to ensure that credit unions would effectively meet members' borrowing needs. It would seem, therefore, that Congress assumed implicitly that a common bond amongst members would ensure both that those making lending decisions would know more about applicants and that borrowers would be more reluctant to default. That is surely why it was thought that credit unions, unlike banks, could

13

"loan on character." The common bond was seen as the cement that united credit union members in a cooperative venture, and was, therefore, thought important to credit unions' continued success.

*First Nat'l Bank and Trust Co.*, 988 F.2d at 1276 (citation omitted).

Or, as a commentator has noted,

A credit union is unique in that it "loans on character." It is a cooperative society, and its financial stability hinges on the interpersonal dynamics of its members: Lenders must be able to evaluate the ability and willingness of potential borrowers to pay back their loans, and borrowers must feel obligated to pay back those loans. If all of the members of a credit union share a common bond—for example, if they live in the same neighborhood or work for the same employer—they have more information about each other, and will suffer greater shame if they default on their loans. A common bond is thus a key element of a successful cooperative.

Cassity, *supra*, at 337 (citation footnotes omitted).

Whereas traditional banks and other financial institutions could serve only the more financially stable people, because they required people to leverage their property to obtain loans, credit unions were thought to serve those who were not wealthy by, in essence, allowing them to leverage their reputations instead. Credit was extended not on wealth but on character and standing in the community. Community and cooperation thus stood at the core of credit unions. The common-bond requirement was the means of injecting those values into the daily operations of credit unions.

These characteristics, though no doubt diluted given the size of modern credit unions and the lessening importance of community to modern life,[3]

---

[3] Some commentators have argued that modern credit unions do not operate pursuant to these values, *e.g.*, Cassity, *supra*, at 340 ("This species of credit union bears little external resemblance to the local neighborhood cooperative societies of the 1930s."),

14

continue in Kentucky's credit union statutes. For example, "credit union,"

under Kentucky law,

> means a cooperative, nonprofit association, incorporated . . . for the purposes of encouraging thrift among its members, creating a source of credit at a fair and reasonable rate of interest, and providing an opportunity for its members to use and control their own money on a democratic basis in order to improve their economic and social condition.

KRS 286.6-005. The common-bond requirement, which is the "cement" necessary to a credit union's success, also continues under current law, appearing in both subsections of KRS 286.6-107.

In fact, this focus on the common-bond requirement provides a logical explanation for the legislature's deviation from the model act. Previous versions of the statute had included the common-bond requirement, though it was called "mutual affiliation" in those earlier versions, and the legislature apparently wanted to keep it in the amended version. However, subsection (2) of the Model Act separates allowable membership into three groups, only one of which requires a common bond: "groups having a common bond of similar occupation, association, or interest"; "groups who reside" in certain geographical areas, but with no requirement that they share a common bond; and "persons employed" within certain business locations, but again with no requirement that they share a common bond. As the legislature wanted to restrict membership in credit unions to people who share a common bond, it did not want to include the latter two groups in its statute; and so, it omitted

---

and therefore they should be subject to the same regulatory schemes as banks, *see generally id.*

15

them, and relied on the common-bond requirement to limit the broad category it had included.

The common-bond requirement, particularly the history behind it, is the frame through which the statute should be viewed. It appears to be a sword that cuts both ways, in that it limits credit union membership overall while also showing that the categories listed in KRS 286.6-107(2) should be read broadly.

No doubt, the requirement is intended to serve as a limit on allowable credit union membership. As the U.S. Supreme Court has noted of the federal version of the requirement, "Because, by its very nature, a cooperative institution must serve a limited market, the legislative history of [the common-bond requirement of the FCUA] demonstrates that one of the interests 'arguably ... to be protected' by [the common-bond requirement] is an interest in limiting the markets that federal credit unions can serve." *Nat'l Credit Union Admin*, 522 U.S. at 494 n.6. This confirms that credit union membership, even where broad terms are used, is not limitless. In fact, our statutes previously limited membership to the relatively small number of two thousand members.

Yet those broad terms clearly evidence an intention to depart from the strict limits formerly included in the statute. The question is, how much of a departure was intended? And how exactly does the limiting aspect of the common-bond requirement affect the terms used in the Kentucky statute, "association" and "interest"?

In light of the history recounted above, the Appellants cannot realistically argue that they fall under the association category. "Association" is the easier

16

of the two terms to understand because it shows up repeatedly in the various versions of the Kentucky statute. It appears in the very first version in 1922, but is not defined. The 1940 version of the statute did not define the word either, but it did express what the term traditionally meant as it related to credit unions. One of the allowed categories of membership under the 1940 statute was "duly enrolled membership in a religious, social, or educational group or *association*." (Emphasis added.) Association, thus, refers to a formal group that exists for some purpose other than credit union membership. Examples of such groups include churches, philanthropic organizations, unions, and schools. The members of such organizations have common purposes and are likely to know each other, which demonstrate the common bond that lies at the heart of credit union success.

Though the term "association" is still broad, it is not so expansive as to include mere geographical proximity. Thus, it does not include the traditional community field of membership.

The Appellants, however, do fit under the interest category. The word "interest" does not appear in prior versions of the statute. It was a wholly new and intentionally broad term. However, it is not without a limit because the term must be construed in light of the common-bond requirement. A proposed interest-based field of membership cannot be so vague or tenuous that a reasonable person would fail to see a common bond between the persons sharing the interest. The interest must be definable and concrete enough to demonstrate the common bond. It must be a concrete enough interest to serve "as the cement [to] unite[] credit union members in a cooperative venture."

*First Nat'l Bank and Trust Co.*, 988 F.2d at 1276. The definition from *Black's Law Dictionary* is helpful here, with its emphasis on "advantage or profit of a financial nature" and "[a] legal share in something; all or part of a legal or equitable claim to or right in property." The requisite interest is one that gives a member of the credit union incentives both to extend credit to the other members and to police the use of that credit.

Thus, that a group of persons share the same hobby or enjoy novels by the same author, while technically a shared interest, is insufficient to demonstrate the common bond required to form a credit union. The shared interest in such cases does not link such persons in any substantial way or create any sort of financial or legal interdependence.

A geographic connection is different, however. Persons who live in the same neighborhood or rural farming district do have a concrete shared interest that demonstrates a common bond. The persons in a neighborhood know each other and are aware of each others' reputations, and thus have an advantage over strangers in evaluating each others' credit-worthiness, at least to the extent that the theory underlying credit unions is correct. Moreover, such persons are linked financially since the value of one house affects the value of the others in the neighborhood. The extension of credit to a neighbor could have a direct effect on property values, since a default could lead to a foreclosure or a lien on a house. Thus, the shared interest is intimately linked to the operation of the credit union.

The same could be said of a rural farming district, where the farmers know each other and the success of the farming community as a whole is an

interest shared by everyone in the community. Similar substantial interests—a shared stake, if you will—exist for other geographic categories and can be sufficient interests on which to base a credit union field of membership under the current statute. The shared *interest* here is a nexus of financial interdependence that simply does not exist where the persons are separated by great distances or where their shared interest is insubstantial, such as a hobby.

Thus, this Court holds that a geographic or community field of membership is allowed under the current language of KRS 286.6-107.

For the foregoing reasons, the Court of Appeals is reversed and this matter is remanded for entry of a judgment consistent with this Opinion.

Schroder, Scott and Venters, JJ., concur. Minton, C.J.; Abramson and Cunningham, JJ., concur in result only.

COUNSEL FOR APPELLANTS:

David Thomas Wilson, II
Skeeters, Bennett, Wilson & Pike
550 West Lincoln Trail Blvd.
Radcliff, Kentucky 40160


COUNSEL FOR APPELLEE:

Jill F. Endicott
Dinsmore & Shohl, LLP
2500 National City Tower
101 South Fifth Street
Louisville, Kentucky 40202