# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued March 12, 2019        Decided August 16, 2019

No. 18-1213

TWIN RIVERS PAPER COMPANY LLC, ET AL.,
PETITIONERS

v.

SECURITIES AND EXCHANGE COMMISSION,
RESPONDENT

———

On Petition for Review of an Order of
the Securities & Exchange Commission

———

*Jane C. Luxton* argued the cause and filed the briefs for petitioners.

*Alan W. Bakowski* was on the brief for *amici curiae* Public and Private Companies, Nonprofit Organizations, and Labor Union in support of petitioners.

*Tracey A. Hardin*, Assistant General Counsel, Securities and Exchange Commission, argued the cause for respondent. With her on the brief were *Michael A. Conley*, Solicitor, and *Daniel E. Matro*, Senior Counsel.

*Eugene Scalia*, *Jacob T. Spencer*, and *Paul S. Stevens* were on the brief for *amici curiae* Investment Company Institute and Independent Directors Council in support of respondent.

Before: HENDERSON, ROGERS, and KATSAS, *Circuit Judges*.

KATSAS, *Circuit Judge*: In 2018, the Securities and Exchange Commission adopted a rule allowing investment companies to post shareholder reports online and mail paper copies to shareholders upon request. The petitioners—a consumer-advocacy organization and representatives of the paper industry—argue that the SEC did not adequately consider the interests of shareholders who prefer reports in paper form. Because the consumer organization lacks constitutional standing and the paper-industry representatives assert interests beyond those protected or regulated by the securities laws, we deny the petition for review.

I

The Securities and Exchange Commission requires investment companies, such as mutual funds, to transmit periodic shareholder reports to their investors. *See*, *e.g.*, 17 C.F.R. § 270.30e-1. Previously, the SEC required the companies to mail paper copies unless an investor affirmatively selected electronic delivery. In 2018, the Commission adopted Rule 30e-3, which allows companies to change their default method of transmission. *See Optional Internet Availability of Investment Company Shareholder Reports*, 83 Fed. Reg. 29,158 (June 22, 2018) (*Shareholder Reports*). The rule now permits investment funds to post shareholder reports online and notify investors of their availability. *See* 17 C.F.R. § 270.30e-3(b)–(d). Investment companies must mail shareholder reports only to investors who expressly request a paper copy. *See id.* § 270.30e-3(e).

The SEC gave two principal rationales for this change. First, it projected that the rule would save investment funds about $140 million annually. *Shareholder Reports*, 83 Fed. Reg. at 29,187. It explained that because printing costs are paid from fund assets, these savings ordinarily will be "passed along to investors." *Id.* at 29,183. Second, the Commission concluded that "many investors would prefer enhanced availability of fund information on the internet." *Id.* at 29,165. It explained that "an investor looking for a fund's annual report is most likely to seek it out on the fund's website, rather than request it by mail or phone." *Id.* at 29,165 n.96. Moreover, internet usage "has continued to increase rapidly" over the last decade, including among "households owning mutual funds." *Id.* at 29,165 n.97. In short, the SEC expected the rule to match shareholder preferences and save them money.

The Commission recognized that some investors may still prefer paper delivery of shareholder reports. *See, e.g., Shareholder Reports*, 83 Fed. Reg. at 29,165–66. Several features of Rule 30e-3 accommodate that preference. The rule prescribes an extended transition period: investment companies must continue to deliver paper copies of the reports until at least January 1, 2021, and they must include with each mailing a statement advising shareholders of the coming change in the default mode of transmission. *See* 17 C.F.R. § 270.30e-3(i). Then, after making the switch, a fund must mail a paper notice to all shareholders for each report that it posts online. *See id.* § 270.30e-3(c). The notice must include a toll-free telephone number that investors may call to request a paper copy of the individual report or all future reports. *See id.* § 270.30e-3(c)(1)(i)–(v). The notice also may specify other ways to request paper reports, such as by e-mail or online. *See id.* § 270.30e-3(c)(2). Finally, once an investor requests a paper copy, the fund must mail the report within three business days at no cost to the investor. *Id.* § 270.30e-3(e).

4

This case presents two sets of petitioners. Consumer Action is a non-profit membership organization that represents certain consumer interests. Twin Rivers Paper Company and three industry organizations—which we call the Industry Petitioners—represent the interests of the American paper industry. Together, the petitioners argue that the SEC adopted Rule 30e-3 in violation of three securities laws and the Administrative Procedure Act. Among other grounds, they contend that the Commission did not adequately protect shareholders who prefer paper delivery.

II

We begin with the question whether Consumer Action has constitutional standing to challenge Rule 30e-3. The Constitution limits the "judicial Power of the United States" to "Cases" or "Controversies," U.S. Const. art. III, §§ 1–2, and the requirement of standing is "rooted in the traditional understanding of a case or controversy," *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). To establish standing under Article III, a party "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.*

Consumer Action claims standing on behalf of its members. To establish representational standing, an organization must prove, among other things, that its members would "have standing to sue in their own right." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). In turn, this requires proof that at least one member suffered an injury in fact—"an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (cleaned up). "A 'concrete'

injury must be '*de facto*'; that is, it must actually exist." *Spokeo*, 136 S. Ct. at 1548. Moreover, a party cannot rest on "abstract," *id.*, or "conclusory" assertions of injury, *Block v. Meese*, 793 F.2d 1303, 1308 (D.C. Cir. 1986), but must point to "specific, concrete facts demonstrating … harm," *Warth v. Seldin*, 422 U.S. 490, 508 (1975).

In *Sierra Club v. EPA*, 292 F.3d 895 (D.C. Cir. 2002), we explained the procedures for proving standing when a petitioner seeks review of agency action directly in a court of appeals. "The party invoking federal jurisdiction bears the burden of establishing" standing, which "must be supported in the same way as any other matter on which the [party] bears the burden of proof." *Defs. of Wildlife*, 504 U.S. at 561. So a petitioner "must either identify in [the administrative] record evidence sufficient to support its standing to seek review or, if there is none because standing was not an issue before the agency, submit additional evidence to the court of appeals." *Sierra Club*, 292 F.3d at 899. Moreover, because "full development of the arguments for and against standing requires the same tried and true adversarial procedure we use for the presentation of arguments on the merits," the petitioner must make this evidentiary presentation no later than when it files the opening brief. *Id.* at 900. We have reiterated these principles many times. *See, e.g.*, *Del. Dep't of Nat. Res. & Envt'l Control v. EPA*, 785 F.3d 1, 8 (D.C. Cir. 2015); *Texas v. EPA*, 726 F.3d 180, 198 (D.C. Cir. 2013); *Int'l Bhd. of Teamsters v. TSA*, 429 F.3d 1130, 1134–36 (D.C. Cir. 2005). And we have codified them in our Circuit Rule 28(a)(7), which provides that, "[i]n cases involving direct review in this court of administrative actions, the brief of the appellant or petitioner must set forth the basis for the claim of standing," and that, "[w]hen the appellant's or petitioner's standing is not apparent from the administrative record, the brief must include arguments and evidence establishing the claim of standing."

Consumer Action's initial submissions fail to show that its members suffered or will suffer an injury in fact. To establish such an injury, an organization must provide "individual affidavits" from "members who have suffered the requisite harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009). It is "not enough to aver that unidentified members have been injured." *Chamber of Commerce v. EPA*, 642 F.3d 192, 199 (D.C. Cir. 2011). Despite these settled rules, Consumer Action failed to submit any member affidavits with its opening brief, and its own affidavit fails to identify any individual members. Moreover, the affidavit barely describes even the general contours of its membership. The affidavit states that "members, followers and supporters include retirees and retirement savers," as well as "representatives of a national network of nearly 7,000 community-based organizations that serve seniors, minority Americans, disabled Americans, and individuals living in rural areas." Pet. Add. at 433. Left unclear is whether the *members* are retirees and retirement savers, members of other unnamed organizations, or perhaps neither. To be sure, the opening brief states that Consumer Action's "members" include seniors, Americans who lack internet access, and others. Pet. Br. at 17. But the brief still fails to identify individual members, as required by *Earth Island Institute*. And in any event, a petitioner must support its standing "by affidavit or other evidence," *Sierra Club*, 292 F.3d at 899 (quotation marks omitted), and briefs "are not evidence," *id.* at 901. Finally, the affidavit states only that unspecified members or others "prefer a choice to have paper communications" and wish to avoid the "burdens imposed by SEC's Rule 30e-3." Pet. Add. at 433. The former statement is puzzling because Rule 30e-3 preserves investors' ability to choose between electronic and paper communications. As for the latter statement, "general allegations of injury are insufficient," *Conservation Force, Inc. v. Jewell*, 733 F.3d 1200, 1207 (D.C. Cir. 2013), so a reference to unspecified

"burdens" is not proof of "direct, real, and palpable" injury, *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 914 (D.C. Cir. 2015) (quotation marks omitted).

Likewise, nothing in the administrative record shows a concrete injury to identified members of Consumer Action. The organization notes that, in various comments made during the rulemaking, it warned that Rule 30e-3 would decrease readership of shareholder reports, investor access to information, and transparency. But none of the comments tied these harms to any identified members. Consumer Action further notes that the SEC acknowledged its comments that the rule would disadvantage seniors and minorities. *See Shareholder Reports*, 83 Fed. Reg. at 29,162 n.51. But again, neither the comments themselves, nor the SEC's response, addressed whether the harms alleged would befall identified members of Consumer Action. This should hardly be surprising: Article III standing requirements do not apply to agency rulemaking, so Consumer Action would have had no occasion to argue, and the SEC would have had no occasion to decide, whether the proposed rule would inflict an injury on identified members of the organization. And because Consumer Action was not itself an object of the rulemaking, its standing would not likely have been apparent. *See Sierra Club*, 292 F.3d at 899–900.

Consumer Action submitted affidavits from individual members with its reply brief, but they came too late. We may excuse forfeitures of non-jurisdictional preservation requirements for "good cause." *Sierra Club*, 292 F.3d at 900. In the context of *Sierra Club* and Circuit Rule 28(a)(7), we have found such good cause in two circumstances: where "the parties reasonably, but mistakenly, believed that the initial filings before the court had sufficiently demonstrated standing," *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588,

599 (D.C. Cir. 2015) (quoting *Ams. for Safe Access v. DEA*, 706 F.3d 438, 443 (D.C. Cir. 2013)); and where the parties "reasonably assumed that [their] standing was self-evident" from the administrative record, *Am. Library Ass'n v. FCC*, 401 F.3d 489, 494 (D.C. Cir. 2005); *see Del. Dep't of Nat. Res. & Envt'l Control*, 785 F.3d at 8; *Town of Barnstable v. FAA*, 740 F.3d 681, 691 (D.C. Cir. 2014). In this case, Consumer Action could not reasonably have believed that its barebones affidavit, vaguely describing the preferences and burdens of unnamed members and others, sufficed to prove its representational standing. Nor could it reasonably have believed that its standing was self-evident from the rulemaking record.

Consumer Action suggests that *Communities Against Runway Expansion, Inc. v. FAA*, 355 F.3d 678 (D.C. Cir. 2004) (*CARE*), allows a petitioner to prove standing for the first time in a reply brief, so long as standing is obvious. We do not read *CARE* that broadly. There, an organization challenged the approval of a runway expansion at Logan Airport. With its opening brief, the organization submitted affidavits from members who lived nearby, but the affidavits lacked "facts sufficient to support a finding that the declarants would be exposed to a concrete and particularized 'injury in fact' as a result of the contested project." *Id.* at 684. With its reply brief, the organization submitted additional affidavits from other members who declared that they would experience "increased noise from aircraft operations at Logan." *Id.* *CARE* thus involved new factual material tendered to shore up deficient individual affidavits submitted with the opening brief. In that circumstance, we considered the reply affidavits—which, we stressed, made the organization's standing "patently obvious" and "irrefutable." *Id.* at 685.

This case differs from *CARE* in three critical respects. First, Consumer Action made a far less substantial showing of

standing in its initial submissions. In *CARE*, the organization tendered affidavits from members who lived near Logan Airport and alleged injury in at least general terms. *See* 355 F.3d at 684. So, there was at least arguably good cause to excuse the forfeiture. *See Ctr. for Sustainable Econ.*, 779 F.3d at 599. Here, in contrast, Consumer Action tendered no member affidavits, identified no specific members, and failed to describe its membership in even general terms. This cannot amount to good cause.

Second, the reply affidavits in this case raise an entirely new theory of standing. In *CARE*, the injury pinned down in the reply affidavits—increased airport noise—was hardly surprising in light of initial submissions from individuals living near an airport and complaining about a runway expansion. Here, in contrast, the opening submissions give no sense of the theory of injury introduced in reply. Consumer Action's opening affidavit speaks vaguely of "burdens," and its opening brief elaborates that Rule 30e-3 will harm members "with respect to their ability not only to access but also to understand critical shareholder information." Pet. Br. at 17. Yet, in the reply submissions, some affiants stress ideological opposition to Rule 30e-3, *see* Pet. Reply Add. at 50 ("I do not believe I should have to take these extra steps to continue receiving paper copies of my information"); *id.* at 59 ("I do not like the idea of fund managers relying on 'implied consent' to stop sending paper copies"), while others do not wish to "spend [their] valuable time" to make a toll-free telephone call to receive paper copies of shareholder reports, *id.* at 55–56, 58. No member alleges impeded access to or understanding of shareholder reports. In short, the original suggestion of impaired access and understanding has morphed into an objection about having to make a free phone call.

We cannot read *CARE* to permit reply affidavits that propose a new theory of injury—whether obvious or not. Because standing must be shown in the same way as other issues, *Defs. of Wildlife*, 504 U.S. at 561, we have held that "the ordinary rules of forfeiture apply to standing," *Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 179 (D.C. Cir. 2019). Those rules include the basic precept that arguments generally are forfeited if raised for the first time in reply. *See*, *e.g.*, *United States v. Van Smith*, 530 F.3d 967, 973 (D.C. Cir. 2008). Likewise, an argument is forfeited if the petitioners "were obscure on the issue in their opening brief and only warmed to the issue in their reply brief." *Novak v. Capital Mgmt. & Dev. Corp.*, 570 F.3d 305, 316 n.5 (D.C. Cir. 2009) (cleaned up). At best, that is what Consumer Action has done here, for its opening submissions did not fairly raise the theory of injury that it now seeks to press. We recognize that *Americans for Safe Access* considered a theory of injury first raised in a supplemental brief ordered by this Court. *See* 706 F.3d at 443–45. But we reasoned that the agency, by not arguing in its own later submission that the theory was raised too late, forfeited its forfeiture argument. *Id.* at 444. Here, in contrast, the SEC had no comparable opportunity to respond to the theory of injury first raised by Consumer Action in its reply. And in any event, it has stressed all along that "[a] petitioner is generally required to meet its burden to establish standing in its opening brief." Resp. Br. at 22.

Third, the reply affidavits in this case hardly make standing patently obvious. The affiants stating ideological opposition to Rule 30e-3 plainly *lack* standing, for an "interest in the proper administration of the laws" is quintessentially "nonconcrete." *Earth Island Inst.*, 555 U.S. at 497 (quotation marks omitted). The affiants complaining of lost time present a closer question. On the one hand, even a small financial injury confers Article III standing. *See*, *e.g.*, *Carpenters Indus.*

*Council v. Zinke*, 854 F.3d 1, 5 (D.C. Cir. 2017).  On the other hand, at least where intangible injuries are at issue, either the injury must have "a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts," or a statute must make the injury "legally cognizable."  *Spokeo*, 136 S. Ct. at 1549 (quotation marks omitted).  Consumer Action cites an out-of-circuit decision predicating Article III standing on "the occupation of [a] fax machine for … one minute."  *Palm Beach Golf Ctr.– Boca, Inc. v. John G. Sarris, D.D.S., P.A.*, 781 F.3d 1245, 1251 (11th Cir. 2015) (parentheses omitted).  But *Palm Beach Golf* arose under the Telephone Consumer Protection Act, which created statutory protection against unwanted phone or fax solicitations.  *See id.* at 1252.  Here, in contrast, we are aware of no analogous statute that protects shareholders from having to use the telephone.  Nor does Consumer Action contend that the minimal time lost in making a free phone call bears any close relationship to injuries traditionally deemed adequate in law.  These may be debatable questions, but Consumer Action frustrated the adversarial process by teeing them up for the first time in reply.  Under these circumstances, we cannot find standing based on its reply submissions.

## III

To seek judicial review, the Industry Petitioners must assert interests falling "arguably within the zone of interests to be protected or regulated" by the laws that they invoke.  *Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388, 396 (1987) (quotation marks omitted).  This rule was once described as one of "prudential standing," but then, in a case originating in district court, was recast as one for "determining who may invoke the cause of action" providing the basis for the lawsuit.  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014).  The zone-of-interests requirement also limits who

may seek judicial review directly in a court of appeals, as we have recognized both before and after *Lexmark*. *See*, *e.g.*, *Sierra Club v. EPA*, 755 F.3d 968, 976 (D.C. Cir. 2014); *Hazardous Waste Treatment Council v. Thomas*, 885 F.2d 918, 921–22 (D.C. Cir. 1989) (*HWTC*). Protected interests are ones asserted either by "intended beneficiaries" of the statute at issue or by other "suitable challengers"—*i.e.*, parties whose interests coincide "systemically, not fortuitously" with those of intended beneficiaries. *HWTC*, 885 F.2d at 922–24. These rules are designed to prevent litigation by parties "whose suits are more likely to frustrate than to further statutory objectives." *Id.* at 922 (quotation marks omitted).

The Industry Petitioners contend that Rule 30e-3 violates the Securities Act of 1933, the Securities Exchange Act of 1934, and the Investment Company Act of 1940. Two of those statutes permit any person aggrieved by an SEC regulation to seek judicial review in this Court. *See* 15 U.S.C. §§ 77i(a), 80a-42(a); *N.Y. Republican State Comm. v. SEC*, 799 F.3d 1126, 1130–34 (D.C. Cir. 2015).[1] The Industry Petitioners also invoke the Administrative Procedure Act, but it neither creates jurisdiction, *Califano v. Sanders*, 430 U.S. 99, 104–07 (1977), nor augments specific-review provisions like those in the securities statutes, *see* 5 U.S.C. § 704; *Bennett v. Spear*, 520 U.S. 154, 161–62 (1997). As their basis for constitutional standing and statutory aggrievement, the Industry Petitioners allege that Rule 30e-3 will harm paper companies by reducing the demand for their products. So the dispositive question is

---

[1] All three statutes permit any person aggrieved by an SEC "order" to seek judicial review in this Court. 15 U.S.C. §§ 77i(a), 78y(b)(1), 80a-42(a). The word "order" encompasses SEC rules in the context of the Securities Act and the Investment Company Act, *see N.Y. Republican State Comm.*, 799 F.3d at 1130–34, but not in the context of the Exchange Act, *Am. Petrol. Inst. v. SEC*, 714 F.3d 1329, 1333–37 (D.C. Cir. 2013).

whether that interest—in selling more paper—is one arguably protected by the securities laws.

As sellers of paper, the Industry Petitioners are not intended beneficiaries of the securities laws. The Securities Act "regulates initial distributions of securities," and the Exchange Act "regulates post-distribution trading." *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 171 (1994). These statutes "embrace a fundamental purpose to substitute a philosophy of full disclosure for the philosophy of *caveat emptor*." *Id.* (cleaned up). Likewise, the Investment Company Act regulates investment companies to protect investors. *See* 15 U.S.C. § 80a-1(b). In sum, "shareholders [are] the direct and intended beneficiaries" of the securities laws, *Piper v. Chris-Craft Indus., Inc.*, 430 U.S. 1, 32 (1977)—and paper sellers are not.

That leaves the question whether the interests asserted by the Industry Petitioners systematically coincide with those of shareholders. In *HWTC*, we held that a group representing the interests of waste treatment plants could not challenge the alleged laxity of regulations under the Resource Conservation and Recovery Act. We reasoned that overly stringent regulation might sometimes harm environmental interests, but waste treatment facilities—which stand to profit from it—would urge stricter regulation "whether the effect on health and the environment [was] good, bad, or indifferent." 885 F.2d at 924–25. We have applied this holding repeatedly, *see Sierra Club*, 755 F.3d at 976, and we have extended it to bar challenges by manufacturers of pollution-control equipment to the alleged laxity of regulations under the Clean Air Act, *see Cement Kiln Recycling Coal. v. EPA*, 255 F.3d 855, 870–71 (D.C. Cir. 2001).

Those cases control this one. As paper companies, the Industry Petitioners would prefer paper disclosure for all shareholders. There is no reason to think that this unqualified preference systematically aligns with the interests of shareholders. In fact, there is good reason to believe the opposite. As the SEC explained, "an investor looking for a fund's annual report is most likely to seek it out on the fund's website, rather than request it by mail or phone." *Shareholder Reports*, 83 Fed. Reg. at 29,165 n.96. So, the Industry Petitioners already are opposed to the largest cross-section of individual shareholders. Moreover, there is a pronounced and growing trend in favor of internet usage, especially among households that own mutual funds. *See id.* at 29,165 n.97. Thus, the conflict between the interests of paper sellers and those of shareholders is likely to increase over time. This suggests a systematic *mis*alignment with shareholder preferences, which makes paper companies distinctly *un*qualified to advance the interests of shareholders.

The Industry Petitioners invoke *First National Bank & Trust Co. v. National Credit Union Administration*, 988 F.2d 1272 (D.C. Cir. 1993), and *Honeywell International, Inc. v. EPA*, 374 F.3d 1363 (D.C. Cir. 2004). These cases permitted suits to enforce specific entry restrictions imposed on competitors of the plaintiffs or petitioners. In *First National Bank*, we allowed a bank to challenge an agency decision allowing a rival credit union to expand its membership. 988 F.2d at 1275–79. The bank argued that the decision violated a statute limiting membership to "groups having a common bond of occupation or design." *Id.* at 1273 (quotation marks omitted). In *Honeywell*, we permitted a company to challenge an agency decision allowing a competitor to market certain products. 374 F.3d at 1370–71. The company argued that the agency impermissibly had rested on economic rather than environmental considerations, in violation of section 612(c) of

the Clean Air Act. *See id.* at 1365, 1371–72. In both cases, we distinguished *HWTC* on the ground that "the potentially limitless incentives of competitors were channeled by the terms of the statute into suits of a limited nature brought to enforce the statutory demarcation." *First Nat'l Bank*, 988 F.2d at 1278; *see Honeywell*, 374 F.3d at 1370–71. In other words, both cases involved statutes that "constrain[ed] competitors to a limited role in guarding a congressionally drawn boundary." *First Nat'l Bank*, 988 F.2d at 1278.

The challenge here is not so limited. The SEC adopted Rule 30e-3 under general grants of rulemaking authority to carry out the purposes of the Securities Act, the Exchange Act, and the Investment Company Act. *See* 15 U.S.C. §§ 77s(a), 78w(a), 80a-37(a). In exercising these authorities, the Commission must consider "the public interest," "the protection of investors," and "whether the action will promote efficiency, competition, and capital formation." 15 U.S.C. §§ 77b(b), 78c(f), 80a-2(c). The Exchange Act further prohibits rules that impose "a burden on competition not necessary or appropriate in furtherance of the purposes of this chapter." *Id.* § 78w(a)(2). The Industry Petitioners argue that the Commission violated these provisions, but none of them forms a discrete "statutory demarcation" enforceable by "suits of a limited nature." *First Nat'l Bank*, 988 F.2d at 1278. Because the securities laws impose no meaningful constraint on the Industry Petitioners' ability and incentive to push paper regardless of the interests or preferences of shareholders, the controlling precedent here is *HWTC*.

IV

Consumer Action lacks Article III standing, and the Industry Petitioners assert interests beyond those arguably

protected or regulated by the securities laws.  Accordingly, we deny the petition for review.

*So ordered.*