# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued March 18, 2021        Decided July 9, 2021

No. 20-5158

NATIONAL COUNCIL FOR ADOPTION,
APPELLANT

v.

ANTONY J. BLINKEN, IN HIS OFFICIAL CAPACITY AS U.S.
SECRETARY OF STATE, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:18-cv-02704)

*Daniel J. Hay* argued the cause for appellant. With him on the briefs were *Kwaku A. Akowuah* and *C. Frederick Beckner III.*

*William R. Peterson* and *Catherine L. Eschbach* were on the brief for *amicus curiae* Center for Adoption Policy in support of appellant.

*Kannon K. Shanmugam*, *Aimee W. Brown*, and *William T. Marks* were on the brief for *amicus curiae* the Academy of Adoption & Assisted Reproduction Attorneys, Inc. in support of appellant.

2

*Benjamin J. Beaton* and *David Norris* were on the brief for *amicus curiae* Richard Klarberg in support of appellant.

*Caroline D. Lopez*, Attorney, U.S. Department of Justice, argued the cause for appellees. With her on the brief were *Brian M. Boynton*, Acting Assistant Attorney General, and *Sharon Swingle*, Attorney.

Before: PILLARD and WALKER, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* WALKER.

WALKER, *Circuit Judge*: Members of the National Council For Adoption help prospective parents adopt children. In 2018, the Department of State issued guidance barring adoption agencies from referring certain children to certain parents.

When the Council challenged that guidance, the district court dismissed its suit for lack of subject matter jurisdiction after concluding that the Council lacked standing. We reverse that decision.

We also conclude that the guidance is a legislative rule. And because the Department of State issued it without the required notice-and-comment process, the guidance must be vacated.

I

A

In February 2018, the Department of State posted to its website a list of frequently asked questions about international-

adoption fee schedules.[1]  In something of a postscript, one of the answers mentioned that "a soft referral is not [an] acceptable practice under the regulations and may lead to adverse action."  J.A. 57 (cleaned up).

This sentence sparked confusion among members of the adoption community because many of them had never heard the phrase "soft referral."  *See, e.g.*, J.A. 145 ("We are unfamiliar with the term 'soft referral.'"); J.A. 149 ("Soft referrals . . . is a term we had never heard of prior to the recent discussions.") (cleaned up).

After receiving numerous questions about what constituted a "soft referral," State updated its website in March 2018 with a page titled "Adoption Notice: Guidance on Soft Referrals."  J.A. 58.  The webpage defined "soft referrals" as two categories of adoption practices.

The first is the act of "informing [prospective adoptive parents] about a specific child before the country of origin has determined that the child is eligible for intercountry adoption . . . , even if the [agency] does not communicate the name of the child to the [parents]."  J.A. 58.

The second — and "more common" — category is "the act of matching a child to a family before . . . approval of the prospective adoptive parents' (PAP) home study and associated background checks."  J.A. 58-59 (emphasis omitted).  According to this March Notice, adoption service providers violate this second prohibition by "matching" an eligible child to a prospective parent "who does not have an approved home study, in a manner that removes that child from

---

[1] Although there are numerous defendants, we refer to them collectively as the "Department of State" or "State."

consideration by other families that the Central or competent authority may wish to consider.  This is sometimes referred to as 'holding' the child."  J.A. 59.

Questions continued pouring in.  So in May 2018, State again updated its website with "FAQ on Soft Referrals."  J.A. 62-67.  It said an adoption service provider may sometimes informally match a child to prospective parents before parents complete their home study.  But the provider cannot "hold" the child's file for those prospective parents in a way that (1) prevents other providers from referring the child to other parents, (2) discourages other parents from adopting the child, or (3) prevents authorities from considering alternative parents. J.A. 64.  The new webpage also claimed the "soft referral guidance clarifies existing policies based on current regulations that have been in place since 2006."  J.A. 62 (emphasis omitted).

We refer to the February "FAQ," March "Notice," and May "FAQ" as the Guidance.

B

After State issued the Guidance, the National Council For Adoption sued State, arguing that the Guidance violated the Administrative Procedure Act.  Specifically, the Council said the Guidance required notice and comment and was otherwise arbitrary and capricious.  After a delay outside the parties' control, the Council proposed setting briefing deadlines, even though State had not yet answered or otherwise responded to the complaint.  The district court agreed.

State then moved to dismiss, arguing, among other things, that the Council lacked associational standing because its

complaint failed to identify a member of the Council injured by the Guidance.

In the facts section of the motion, State explained that the Guidance only prohibited two specific types of soft referrals: (1) matching a non-eligible child to prospective parents or (2) matching a child to parents who haven't completed a home study in a way that prevents the child from being considered by other prospective parents (*i.e.*, holding). Other types of soft referrals, such as matching a child to parents who haven't completed a home study *without* restricting the child from consideration by other prospective parents, were permissible.

The Council opposed the motion to dismiss. It included declarations from some of its members to allege that it had standing. The Council argued, among other things, that the declarations alleged injuries for the Council's members because they stopped conducting soft referrals after the Guidance.

In reply, State claimed the declarations were insufficient because they only generally referred to members "matching" children to parents who had not completed home studies, which the Guidance permitted. State said the declarations did not specify that any member participated in the two types of prohibited soft referrals.

While the motion to dismiss was pending, both parties cross-moved for summary judgment in accordance with the court's deadlines. In addition to arguing the merits, State reiterated — in the introduction to both its own motion for summary judgment and its response to the Council's — its position that the Council lacked standing. Then, in its reply brief, to further prove standing, the Council filed two supplemental declarations.

State then moved to strike the supplemental declarations, arguing that the Council should have filed these supplemental declarations sooner. State alternatively argued that the supplemental declarations still failed to establish standing. The Council filed a brief opposing the motion to strike and arguing that State was not prejudiced by the filing of the supplemental declarations. State didn't file a reply.

The district court addressed these motions — the motion to dismiss, the cross-motions for summary judgment, and the motion to strike — all at once. *National Council for Adoption v. Pompeo*, 460 F. Supp. 3d 37 (D.D.C. 2020). First, the court agreed with State that the Guidance prohibited only two types of soft referrals: (1) matching parents to a child not yet eligible for adoption and (2) "holding" an adoptable child for parents who have not yet completed their home studies by preventing other potential parents from connecting with the child. *Id.* at 43-44. The court also agreed with State that the Council's motion-to-dismiss declarations mischaracterized the Guidance as prohibiting *all* soft referrals and did not specify that any members engaged in the two prohibited types. *Id.* at 44. So the court concluded that the Council lacked standing and granted the motion to dismiss.[2]

Second, the district court struck the supplemental declarations as untimely. *Id.* at 50.

Third, the court denied both parties' summary judgment motions as moot. *Id.* at 50-51.

---

[2] The district court concluded that the Council lacked both organizational and associational standing. *National Council for Adoption*, 460 F. Supp. 3d at 49. The Council did not appeal the district court's organizational standing decision.

We have jurisdiction over the Council's appeal. 28 U.S.C. § 1291.

II

First, we explain why the Council has associational standing. [3] Then we discuss why we will exercise our discretion to decide the merits. Last, we hold that the Guidance is a legislative rule, which requires notice and comment.

A

An association has standing if at least one member can establish injury, causation, and redressability. *Natural Resources Defense Council v. EPA*, 489 F.3d 1364, 1370 (D.C. Cir. 2007). The association must also show that "the interests it seeks to protect are germane to its purposes, and that neither the claim asserted nor the relief requested requires that an individual member participate in the lawsuit." *Id.*

The court at times "may allow [plaintiffs] to support their standing in their reply brief, in affidavits submitted along with the reply brief, through citations to the existing record at oral argument, or through additional briefing or affidavits submitted to the court after oral argument." *American Library Association v. FCC*, 401 F.3d 489, 494 (D.C. Cir. 2005); *cf. Feldman v. FDIC*, 879 F.3d 347, 351 (D.C. Cir. 2018) (a district court "must give [plaintiffs] ample opportunity to

---

[3] We review the district court's standing determination de novo, *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015), and its motion-to-strike decision for abuse of discretion, *Capitol Sprinkler Inspection, Inc. v. Guest Services, Inc.*, 630 F.3d 217, 226 (D.C. Cir. 2011).

secure and present evidence relevant to the existence of jurisdiction") (cleaned up).  For example, when "the parties reasonably, but mistakenly, believed" that they "sufficiently demonstrated standing" or when they "reasonably assumed that their standing was self-evident," "good cause" may exist to excuse delayed declarations or affidavits.  *Twin Rivers Paper Co. LLC v. SEC*, 934 F.3d 607, 614 (D.C. Cir. 2019) (cleaned up).

Two circuit precedents help us decide whether to allow supplemental declarations about standing.  In one, we accepted them.   In the other, we didn't.

In *Communities Against Runway Expansion, Inc. v. FAA*, this court found standing based on supplemental declarations filed with the petitioners' court of appeals reply brief.  355 F.3d 678, 685 (D.C. Cir. 2004).   We accepted the declarations because they made standing "patently obvious" and "irrefutable."  *Id.*   And because standing was so apparent, the petitioners' delay did not prejudice the intervenor.  *Id.*

Then, in *Twin Rivers Paper Co. LLC v. SEC*, this court clarified that *Communities Against Runway Expansion* does not broadly mean that petitioners can "prove standing for the first time in a reply brief, so long as standing is obvious."   934 F.3d at 614.   Rather, we found it important that, in *Communities Against Runway Expansion*, the petitioners tried, but failed, to establish standing with enough specificity from declarations attached to the *opening* brief.  *Id.*   The petitioners had then submitted the supplemental declarations in reply to definitively lock in standing, which they had nearly established already.  *Id.* at 614-15.   The supplemental declarations in *Communities Against Runway Expansion* "thus involved new factual material tendered to shore up deficient

individual affidavits submitted with the opening brief." *Id.* at 615.

*Twin Rivers Paper* then distinguished *Communities Against Runway Expansion* and declined to consider reply affidavits, because (1) there was "a far less substantial showing of standing in" the initial affidavits filed with the opening brief, (2) the reply affidavits "raise[d] an entirely new theory of standing," and (3) standing was not as "patently obvious" from the reply affidavits as it had been in *Communities Against Runway Expansion*. *Id.* at 615-16.[4]

For four reasons, this case is more like *Communities Against Runway Expansion*, where we accepted the supplemental declarations, than *Twin Rivers Paper*, where we rejected the supplemental affidavits.

First, the Council reasonably thought it had established standing when it submitted its initial declarations opposing the motion to dismiss. At least one initial declaration seemed to describe a Council member matching children before they had been determined eligible for adoption. *See* Sizemore Decl. at ¶ 6 (J.A. 34) (limiting its description of State's guidance to the ban on pre-eligibility referrals); *id.* at ¶ 8 (noting that the agency "immediately ceased certain recruitment efforts to comply with the guidance"). And other declarations referred to some of the Council's members having participated in matching parents who hadn't completed a home study (but not necessarily holding children for such parents). *See, e.g.*, Perilstein Decl. at ¶ 5 (J.A. 31) ("Since the ban was announced,

---

[4] Although these two cases dealt with declarations and affidavits attached to appellate reply briefs, they analyzed petitions for review, meaning no initial district court was involved. The circuit court was therefore akin to a district court assessing standing.

10

we've received many inquiries from pre-homestudy families about particular waiting children, but they declined to begin a homestudy or the adoption process without some assurance that the specific child of interest to them would be available for them to adopt when their homestudy was completed."). The initial declarations thus went a long way toward showing standing, even if they may not have affirmatively established injury for the two types of soft referrals State prohibits. Then, after State clung to its argument during the summary-judgment briefing, the Council added the supplemental declarations to its reply brief, just in case.

Second, the Council's supplemental declarations did not "raise an entirely new theory of standing." *Twin Rivers Paper*, 934 F.3d at 615. The supplemental declarations just "shore[d] up" the initial ones. *Id.*

Third, injury and causation are patently obvious from the supplemental declarations. For example, Daniel Nehrbass, President of Nightlight Christian Adoptions, testified:

> Nightlight participated in soft referrals of children who were not yet found to be eligible for intercountry adoption and soft referrals that would constitute a "hold" of the child's file under the Department's arguments in this case. But for the Soft Referral Ban, Nightlight would have continued to participate in such soft referrals in appropriate cases.

Nehrbass Suppl. Decl. at ¶ 3 (J.A. 275). Nehrbass's declaration shows that at least one member of the Council suffered an injury due to State's Guidance.

Fourth, just like the party opposing standing in *Communities Against Runway Expansion*, State suffered no

prejudice from the timing of the supplemental declarations' submission. As just explained, at least one of the declarations (Nehrbass's) provided the precise information State had been insisting the Council needed for standing. State "was not prejudiced by its inability to respond to the supplemental declarations" because the Council stated exactly what State had been insisting on. *Communities Against Runway Expansion*, 355 F.3d at 685.

State's behavior following the Council's supplemental declarations further demonstrates an absence of prejudice. In passing, State argued that it was prejudiced because it wouldn't be able to respond to the declarations. But then State went on to attack the declarations' content.

Just as important as what State did is what it didn't do. At no point after the initial declarations did State submit evidence to refute the standing showing. Nor did State explain what else it might have wanted to submit to rebut the standing showing from the supplemental declarations. Most of all, State didn't reply to the Council's opposition to the motion to strike, even though the Council's opposition specifically argued no prejudice. That State left the "no prejudice" argument unrebutted speaks volumes.

Because injury was patently obvious from at least one of the supplemental declarations, which merely "shore[d] up" the original declarations, and because State suffered no prejudice, we hold that the district court abused its discretion in striking the supplemental declarations. *Twin Rivers Paper*, 934 F.3d at 615; *cf. Lujan v. National Wildlife Federation*, 497 U.S. 871, 895-98 (1990) (holding the district court did not abuse its discretion in declining to admit affidavits in support of standing when filed after summary judgment briefing and hearing were complete). And with the supplemental declarations back on

the table, at least one of the Council's members suffered an injury traceable to the Guidance. So the Council met its burden. *See Mendoza v. Perez*, 754 F.3d 1002, 1016 n.9 (D.C. Cir. 2014) ("Having concluded plaintiffs sufficiently demonstrated standing under the standards applicable at the motion to dismiss stage, we have no trouble concluding they also meet their burden under the applicable standard at the summary judgment stage.").

The Council also satisfies the redressability requirement. "[A] party asserting a procedural injury enjoys a somewhat relaxed test as to whether compliance with the procedural requirement would lead to redress of the party's substantive injury." *Association of American Physicians & Surgeons v. Sebelius*, 746 F.3d 468, 472 (D.C. Cir. 2014) (cleaned up). In particular, plaintiffs don't need to show that such a procedural right, like notice and comment, would have actually changed the agency's final rule. *Sugar Cane Growers Co-op of Florida v. Veneman*, 289 F.3d 89, 94-95 (D.C. Cir. 2002); *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 572 n.7 (1992). Here, the possibility that State will reconsider its soft referral prohibitions after notice and comment is enough.

Thus, with injury, causation, and redressability in place, at least one member of the Council — Nightlight Christian Adoptions — has standing to sue in its own right. That's the first prong of associational standing.

State does not contest the other two elements of associational standing, which the Council easily satisfies. The Council seeks to protect the completion of adoptions, which no one at this point questions is "germane to its purposes." *Natural Resources Defense Council*, 489 F.3d at 1370. And nothing about the claims or requested relief requires that "an

individual member [actually] participate in" this suit. *Id.* The Council has therefore established associational standing.

B

When we reverse on threshold matters like standing, we typically remand to the district court to decide the merits of the case. *Piersall v. Winter*, 435 F.3d 319, 325 (D.C. Cir. 2006). That said, we have discretion to take up matters not addressed by the district court. *Id.* For example, in *Mendoza v. Perez*, after reversing on threshold issues, this court decided the merits because the parties asked us to, they fully briefed the merits, another appeal was likely, the standard of review was de novo, and the answer was clear. 754 F.3d at 1020.

So too here. The Council asked us to decide the merits issues. State conceded at oral argument that, if the Council has standing, there is no harm in deciding whether the challenged Guidance required notice and comment. Oral Arg. Tr. at 57-58. Our review of that purely legal question is de novo. *Mendoza*, 754 F.3d at 1020. And its answer is clear. Thus, remanding for the district court to decide the merits in the first instance "would be a waste of judicial resources." *Id.*

C

On the merits, the Council argues the Guidance is a "legislative rule." State argues that the Guidance is an "interpretive rule." The distinction matters because, under the Administrative Procedure Act, legislative rules require notice and comment, but interpretive rules do not. 5 U.S.C. § 553(b)(3)(A); *POET Biorefining, LLC v. EPA*, 970 F.3d 392, 406 (D.C. Cir. 2020).

"A legislative rule is one that has legal effect or, alternatively, one that an agency promulgates with the intent to exercise its delegated legislative power by speaking with the force of law." *Natural Resources Defense Council v. Wheeler*, 955 F.3d 68, 83 (D.C. Cir. 2020) (cleaned up).

In contrast, an interpretive rule "derives a proposition from an existing document, such as a statute, regulation, or judicial decision, whose meaning compels or logically justifies the proposition." *Id.* (cleaned up). "The critical feature of interpretive rules is that they are issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers." *Perez v. Mortgage Bankers Association*, 575 U.S. 92, 97 (2015) (cleaned up). In that sense, an interpretive rule explains "*pre-existing* legal obligations or rights" rather than "creating legal effects." *Natural Resources Defense Council*, 955 F.3d at 83.

Under this framework, the Guidance is a legislative rule.

By expressly prohibiting certain types of soft referrals, State intended to "speak[] with the force of law." *Id.* State does not seriously deny that violating the Guidance exposes adoption agencies to enforcement actions. The Guidance may cost agencies that practice the prohibited types of soft referrals their accreditation. *See* 22 C.F.R. § 96.27(a) (requiring for accreditation that agencies demonstrate "substantial compliance with" certain specified standards); *id.* § 96.75 (requiring that the entity responsible for accrediting agencies "take adverse action" against agencies not so in compliance); *id.* § 96.35(a) (establishing as one such standard that agencies ensure "that intercountry adoptions take place in the best interests of children"); *see also* 82 Fed. Reg. 40,614, 40,615 (Aug. 25, 2017) (memorandum of agreement that the

accrediting entity "will operate under policy direction from [State]").

State says those obligations are nothing new. By its account, the Guidance merely clarified the types of soft referrals State already prohibited. We disagree. State had never before announced a categorical prohibition on the two types of soft referrals the Guidance prohibits. In fact, it's doubtful State had ever even published rules mentioning "soft referrals," much less categorically prohibiting any. That's why, when the Guidance appeared on State's website, some adoption agencies didn't know what a "soft referral" was. *See, e.g.*, J.A. 145 ("We are unfamiliar with the term 'soft referral.'"); J.A. 149 ("Soft referrals . . . is a term we had never heard of prior to the recent discussions.") (cleaned up).

In the parts of the Guidance relevant here, State never said it was clarifying or interpreting specific provisions of a treaty, statute, or regulation that "compel[led] or logically justifie[d]" a prohibition on soft referrals. *Natural Resources Defense Council*, 955 F.3d at 83 (cleaned up). That further illustrates the Guidance's novelty.

Now, on appeal, State specifically points us to "the best interests of children" standard from 22 C.F.R. § 96.35(a), (a)(1) ("[e]nsuring that intercountry adoptions take place in the best interests of children," which is "in accordance with the Convention's principles"). But, even assuming the types of prohibited soft referrals are inconsistent with the best interests of the child in most cases, the Council and amici describe circumstances that show a categorical prohibition is far from "compel[led] or logically justifie[d]" by the best-interests-of-the-child standard. *Natural Resources Defense Council*, 955 F.3d at 83 (cleaned up). For example, is the Guidance's rule

always in the best interests of a child whose biological relatives have almost completed a home study?

The notice-and-comment process makes an agency consider those types of concerns. After that process, State might be able to promulgate a rule — like the Guidance — that applies to each internationally adopted child in a manner that accords with the Administrative Procedure Act. But State cannot pretend that the Guidance merely "explain[s] something" that a context-specific, totality of the circumstances standard "already required." *Mendoza*, 754 F.3d at 1021.

Finally, State says the Guidance is implied by the regulatory context for international adoptions. *See, e.g.*, 42 U.S.C. § 14923; 22 C.F.R. Part 96. But the only parts of that context on which State relies are the requirements that a child be determined eligible for adoption and a home study be completed before an adoption is finalized. Soft referrals are consistent with those requirements. Nothing about the home study statute or regulations, for instance, necessitates home studies before soft referrals. They don't even mention soft referrals. They just require home studies before a child is placed in the home. State's argument ultimately hinges on the best-interests-of-the-child standard, which again does not compel or logically justify the Guidance.[5]

---

[5] State and the Council argue over whether, before the Guidance, State and the accrediting entity sometimes took adverse actions against adoption agencies over soft referrals. But either way, State does not argue that those specific adverse actions compelled the Guidance as a categorical rule or created a legal effect that the Guidance merely explained. Instead, State says those actions suggest that a pre-existing obligation already existed. But as explained above, under the best-interests-of-the-child standard, no such categorical obligation existed.

To sum up, the Guidance is a legislative rule because it makes new law by banning two types of soft referrals. It therefore required notice and comment.[6]

\* \* \*

We reverse the judgment of the district court and remand for the court to enter an order vacating the Guidance and for other action consistent with this opinion.

---

[6] Because we vacate on procedural grounds, we do not reach the Council's substantive challenge to the Guidance. *See Natural Resources Defense Council*, 955 F.3d at 83 (declining to decide the arbitrary-and-capricious question after determining the rule required notice and comment).