# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued October 17, 2023         Decided July 16, 2024

No. 22-1218

SIERRA CLUB,
PETITIONER

v.

UNITED STATES DEPARTMENT OF ENERGY,
RESPONDENT

GOLDEN PASS LNG TERMINAL, LLC,
INTERVENOR

———

On Petition for Review of Orders
of the United States Department of Energy

———

*Louisa Eberle* argued the cause for petitioner. With her on the briefs was *Nathan Matthews*.

*Christopher Anderson*, Attorney, U.S. Department of Justice, argued the cause for respondent. With him on the brief were *Todd Kim*, Assistant Attorney General, and *Justin D. Heminger*, Attorney.

*Jonathan D. Brightbill* argued the cause for intervenor-respondent Golden Pass LNG Terminal LLC. With him on the brief were *Michael J. Woodrum* and *Spencer W. Churchill*.

Before: WILKINS, KATSAS, and PAN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* KATSAS.

KATSAS, *Circuit Judge*: Since 2021, Golden Pass LNG Terminal, LLC has been authorized to export up to 937 billion cubic feet per year of liquified natural gas (LNG) from a new facility in Jefferson County, Texas. Of that amount, 129 billion cubic feet per year could be exported only to countries that have a free-trade agreement (FTA) with the United States, while the rest could be freely exported to FTA or non-FTA countries. In 2022, the Department of Energy removed the FTA-based restriction for the 129 billion cubic feet per year.

Sierra Club challenges the removal of that restriction. It argues that Golden Pass's increased flexibility to select export countries will cause its actual exports to increase, which will cause increased shipping traffic and thus harm the aesthetic and recreational interests of a Sierra Club member who lives near the export facility. This chain of causation is far from obvious. And in its opening brief, Sierra Club offered neither evidence nor argument that removal of the FTA-based restriction is substantially likely to cause export volumes to increase. For that reason, we dismiss the petition for review for lack of Article III standing.

I

The Natural Gas Act prohibits the export of natural gas without prior approval by the Department of Energy. 15 U.S.C. § 717b(a). The standards for approval depend on the destination country. For countries that have a free-trade

agreement with the United States, exports are "deemed to be consistent with the public interest," and DOE must approve export applications "without modification or delay." *Id.* § 717b(c). For countries without an FTA, DOE must approve applications unless it finds, after providing the opportunity for a hearing, that the proposed exports "will not be consistent with the public interest." *Id.* § 717b(a). The Federal Energy Regulatory Commission must separately approve construction or expansion of export facilities. *See id.* § 717b(e).

In light of the different governing standards, DOE separately processes applications to export to FTA and non-FTA countries. For parallel applications involving the same facility, DOE typically grants approvals on a non-additive basis, with the later approval expanding the number of countries to which the facility may export but not the total amount of gas that may be exported. For example, suppose a company first receives authorization to export one million cubic feet of LNG to FTA countries and later receives authorization to export one million cubic feet to non-FTA countries. The company then would become authorized to export a total of one million cubic feet of LNG, which it could direct to countries in either category.

This case involves an LNG terminal that Golden Pass operates in Jefferson County, Texas, near the Gulf of Mexico. The terminal originally was designed as an import facility, but Golden Pass sought to convert it into an export facility when advancements in extraction technology made it economical to export LNG from the continental United States. Golden Pass began this conversion in 2012 and expects to begin exporting around 2026.

By 2017, Golden Pass already had secured authorization to export up to 808 billion cubic feet per year of LNG to FTA

or non-FTA countries from the Jefferson County facility. Golden Pass sought to increase or "uprate" that amount to 937 billion cubic feet per year. In January 2021, FERC approved expansion of the facility's authorized production capacity. In June 2021, DOE approved the increased authorization for export to FTA countries. DOE gave public notice of the pending application to increase authorized exports to non-FTA countries. No party opposed the application, which DOE granted in 2022. Sierra Club then requested rehearing of the 2022 decision, but DOE denied the request.

Sierra Club seeks judicial review of the orders allowing greater export to non-FTA countries and then denying rehearing of that decision.

## II

We begin—and end—with the question of constitutional standing. Article III limits the jurisdiction of federal courts to "Cases" or "Controversies." U.S. Const. art. III, § 2. Standing doctrine implements this case-or-controversy requirement. *See*, *e.g.*, *Allen v. Wright*, 468 U.S. 737, 750–51 (1984).

Sierra Club asserts representational standing on behalf of its members. So, at least one of the members must have standing to sue individually. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). To have such individual standing, the member "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). An injury in fact must be concrete, particularized, and "actual or imminent." *Id.* at 339 (cleaned up). For imminence, a "substantial risk" of future injury is enough. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (cleaned up).

The party invoking federal jurisdiction must establish its standing "in the same way as any other matter" on which that party bears the burden of proof. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). So, whenever standing is "not apparent from the administrative record," a party seeking review of agency action usually must set forth its "arguments and evidence" for standing when filing its opening brief. D.C. Cir. R. 28(a)(7); *see Twin Rivers Paper Co. v. SEC*, 934 F.3d 607, 613 (D.C. Cir. 2019); *Sierra Club v. EPA*, 292 F.3d 895, 899–900 (D.C. Cir. 2002). But despite this familiar rule, we have allowed a petitioner to establish standing in its reply brief in two narrow circumstances: first, if the petitioner "reasonably, but mistakenly, believed" that its opening brief adequately proved standing; and second, if the petitioner "reasonably assumed" that its standing was "self-evident" from the administrative record. *Twin Rivers*, 934 F.3d at 614 (cleaned up). In these circumstances, if the case for standing is at least reasonably apparent when the opening brief is filed, the government may fairly be expected to fully develop any opposing evidence or arguments when filing its brief as the respondent. We have also allowed petitioners to proceed if a reply brief fleshes out a timely raised theory of standing and also makes standing "patently obvious and irrefutable." *Id.* at 614–15 (cleaned up). In that circumstance, irrefutability indicates that the government suffered no prejudice from the lateness of the petitioner's showing.

Sierra Club asserts a claim of representational standing based on harms to a member who lives near the LNG terminal. Tracing these harms to the orders under review requires a three-step causal chain: First, by increasing the volume of LNG that Golden Pass may export to non-FTA countries, the orders under review will cause an increase in the total volumes of LNG that Golden Pass will export. Second, an increase in these export volumes will cause an increase in tanker traffic leaving

the export facility. Third, an increase in tanker traffic will harm the aesthetic or recreational interests of one Mary Bernard, a Sierra Club member who boats and fishes in waters adjacent to the terminal. When filing its opening brief, Sierra Club submitted a declaration from Ms. Bernard, which adequately shows the third step in the causal chain. And we will assume the second step *arguendo*. But neither the opening brief nor the declaration shows that the orders under review are substantially likely to cause increased exports.

Sierra Club's opening brief devotes three lines to the first two causation elements highlighted above. First, Sierra Club asserts that "[i]ncreasing export volumes necessarily increases shipping tanker traffic." Opening Br. at 33. Perhaps so, but that proposition says nothing about whether the orders under review will increase export volumes. Then, Sierra Club provides a single record citation, which it says estimates the "volume of increased traffic." *Id.* But the cited item is the 2020 environmental assessment prepared by FERC in authorizing the increased production capacity of the facility from 808 billion cubic feet of LNG per year to 937 billion cubic feet of LNG per year. J.A. 375. Accordingly, the assessment addressed environmental impacts from increasing the *total* authorized production capacity and export volumes, without distinguishing between FTA and non-FTA countries. It did not consider whether a *non*-additive uprate authorization would likely increase total export volumes.

After DOE contested standing, Sierra Club significantly elaborated on this point in its reply brief. But Sierra Club satisfies no exception allowing it to raise new standing evidence or arguments for the first time in reply.

To begin, Sierra Club could not have reasonably believed that its initial submissions adequately proved standing. Sierra

Club challenges only the 2022 orders permitting increased exports to non-FTA countries. By then, Golden Pass already was authorized to export a total of 937 billion cubic feet of LNG per year: 808 billion cubic feet to either FTA or non-FTA countries, as well as an additional 129 billion cubic feet to FTA countries only. And the orders under review merely removed the country-based restriction from that last increment of volume. Sierra Club's minimal analysis in its opening brief— which suggests that any increase in total exports would cause more tanker traffic—does not tend to show that the 2022 orders, by permitting the final 129 billion cubic feet of LNG to be exported to non-FTA countries as well as to FTA countries, would likely cause an increase in total exports.

Nor could Sierra Club reasonably have thought that the administrative record made this point self-evident. Sierra Club notes that DOE, in its environmental assessment of the requested uprate, assumed that removing the FTA restriction would cause greater exports. But DOE never made any such finding. Instead, the agency reasoned that neither increased domestic drilling for natural gas (if any), nor increased burning of natural gas abroad (if any), would justify scuttling the requested uprate. J.A. 44–47. In doing so, DOE cited studies about the environmental effects of drilling for natural gas and burning it, not studies about whether removing FTA-based restrictions would be likely to cause greater exports. *See* Life Cycle Greenhouse Gas Perspective on Exporting Liquefied Natural Gas From the United States: 2019 Update—Response to Comments, 85 Fed. Reg. 72 (Jan. 2, 2020); Addendum to Environmental Review Documents Concerning Exports of Natural Gas From the United States, 79 Fed. Reg. 48,132 (Aug. 15, 2014). None of this suggests that removing the FTA-based restriction would cause greater total exports.

Finally, the presentation in Sierra Club's reply brief does not make its standing patently obvious and irrefutable. Sierra Club begins with some statistics. It asserts that the United States exports LNG to only seven FTA countries accounting for only 10 percent of all LNG exports. Reply Br. at 7 & n.2. Sierra Club then calculates that, if Golden Pass were to export the entire uprated amount to FTA countries, total U.S. exports to those countries would increase by about 33 percent. *Id.* at 7–8 & n.3. And, it says, "[n]othing indicates that the FTA market could or would absorb these exports." *Id.* at 8. In other words, removing the FTA restriction will cause increased exports because Golden Pass would have been unable to export 129 billion cubic feet per year of LNG just to FTA countries.

This analysis does not tell the whole story. For one thing, as DOE explained, there is "rapid" growth in the total demand for LNG exports from the United States. J.A. 41. Sierra Club's statistics reflect export volumes in 2022, yet the Golden Pass facility is not expected to begin exporting until 2026. J.A. 372 n.1, 397. So a 33 percent increase after four years of rapid growth does not seem obviously infeasible. Moreover, the uprated volume of LNG that Golden Pass may now export without restriction makes up less than 14 percent of the total volume of LNG that Golden Pass may export annually. In other words, even without the uprate authorization, Golden Pass still could have exported to FTA and non-FTA countries in percentages roughly tracking the national averages. So if Golden Pass exports to FTA countries would significantly increase total U.S. exports to FTA countries, as Sierra Club contends, then Golden Pass exports to non-FTA countries likewise would significantly increase total U.S. exports to those countries. Yet Sierra Club does not suggest that Golden Pass will have any difficulty exporting its authorized volumes to non-FTA countries. Nor does it suggest that demand for U.S. exports of LNG is growing any more quickly in non-FTA

countries than it is in FTA countries. Finally, Sierra Club's analysis assumes that the behavior of other exporters will remain constant. But if other companies shift exports from FTA countries to non-FTA countries, Golden Pass could increase exports to FTA countries even if nationwide volumes remained constant in the FTA and non-FTA sectors.

Sierra Club next invokes the "basic economic principles" of supply and demand. Reply Br. at 8. According to Sierra Club, increasing the number of potential customers for the 129 billion cubic feet per year of LNG will increase demand for it and thus result in more of it being exported. *See id.* But unless the relevant economic principles are "self-evident," both in the abstract and as applied to a specific case, we require evidentiary support to establish standing. *Airlines for Am. v. TSA*, 780 F.3d 409, 411 (D.C. Cir. 2015) (cleaned up). For example, in *Competitive Enterprise Institute v. FCC*, 970 F.3d 372 (D.C. Cir. 2020), we found standing based on an expert affidavit confirming the applicability of economic principles that were themselves supported by a Supreme Court decision, agency regulations and guidance, and a leading treatise in the field. *See id.* at 386. By contrast, in *Utility Workers Union v. FERC*, 896 F.3d 573 (D.C. Cir. 2018), we found no standing where the asserted economic principles were unaccompanied by data, analysis, affidavits, or explanations of the specific "market dynamics that might support [the petitioners'] theory of causation." *Id.* at 578. And we required such supporting materials even though the economic principle asserted there— that removal of one large supplier from the relevant market would likely cause a price increase—might have seemed "intuitive, given the laws of supply and demand." *Id.* at 579. In other words, despite invoking an economic principle that seemed "intuitive" in the abstract, the petitioners still needed to put forth evidence showing how the principle governed in the specific case. *See id.*

This case is like *Utility Workers*. Sierra Club invokes the laws of supply and demand at a high level of generality and without further data, analysis, affidavits, or explanations. And its assertions, while superficially plausible, are by no means self-evident. For example, while increased demand generally causes increased output, it may cause only higher prices if the relevant supply curves are price inelastic. And here, the supply curves for exported LNG are inelastic to the extent that exporters may supply only amounts previously approved by the government. If those amounts are below what a free market would otherwise achieve, an increase in demand might cause prices but not output to increase.

Finally, Sierra Club posits that if removal of the FTA restriction would not cause export volumes to increase, then it would have been pointless for Golden Pass to seek it. But as DOE explains, adding non-FTA countries to an authorization provides companies with greater flexibility and thus insures against deteriorating market conditions in the future. That could be valuable even absent a substantial likelihood that Golden Pass would have been unable to export 129 billion cubic feet per year of LNG just to FTA countries. Buying fire insurance often makes sense even absent any substantial risk of fire. Alternatively, as noted above, increased demand might translate into higher prices but not higher volumes, which would be independently valuable to Golden Pass. For these reasons, we cannot confidently infer that export volumes will likely increase just because Golden Pass sought removal of the FTA restriction.

We acknowledge that the case for standing made out by Sierra Club in its reply brief is at least plausible. But it is not "patently obvious and irrefutable." *Twin Rivers*, 934 F.3d at 615 (cleaned up). And because Sierra Club made this case only in its reply brief, DOE lost the opportunity to muster a full

opposition in the ordinary course. Regardless of whether Sierra Club's case would have been sufficient to show standing if made in its opening brief—a question that we need not decide—we cannot permit Sierra Club to make it in these circumstances.[1]

## III

Sierra Club failed to offer any argument or evidence in its opening brief showing that the orders under review are substantially likely to increase export volumes, which is an essential element of its case for Article III standing. Accordingly, we dismiss the petition for review.

*So ordered.*

---

[1] The parties contest whether we have statutory jurisdiction under 15 U.S.C. § 717r(b), which provides judicial review to any "party" aggrieved by an order in any "proceeding" under the Natural Gas Act. Because we resolve this case on alternative jurisdictional grounds, we need not address that question. *See Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999).